Paul Maxwell HONEYCUTT,
Appellant,

v.

STATE of Missouri, Respondent.

No. WD 58306.

Missouri Court of Appeals,
Western District.

Decided July 17, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 28, 2001.

Application for Transfer Denied
Oct. 23, 2001.

Andrew A. Schroeder, Kansas City, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before JAMES M. SMART, JR., P.J., PAUL M. SPINDEN, C.J., and PATRICIA BRECKENRIDGE, J.

PER CURIAM:

Paul Honeycutt appeals the hearing court's January 26, 2000, denial of his Rule 29.15 Motion for Postconviction Relief following an evidentiary hearing. Honeycutt was convicted after a jury trial of one count of murder in the first degree, pursuant to § 565.020, RSMo 1994, and one count of armed criminal action, pursuant to § 571 .015. On October 3, 1996, Honeycutt was sentenced to consecutive terms of life imprisonment without the possibility of probation or parole on the murder charge and to one thousand years' imprisonment on the armed criminal action charge. Honeycutt appeals on the grounds that he was denied his right to effective assistance of counsel in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article 1, §§ 10 and 18(a) of the Missouri Constitution. The judgment is affirmed.

**Factual Background**

In April of 1995, Honeycutt and Cheryl Bolsenga were living in a second-floor apartment in Parkville, Missouri. Around 9:30 p.m., on the evening of April 7, 1995, the neighbors heard loud voices and sounds of arguing coming from the couple's apartment. Eventually, the apartment manager went to Honeycutt's door and told them to quiet down. As the apartment manager was leaving the apartment, the manager heard the sound of a pump-action shotgun and the first of several gunshots. While the manager was at the apartment, a neighbor had positioned himself to look into the window of the apartment and saw a man fire a gun twice. As a police officer arrived, Honeycutt stood in the window with a shotgun. After

receiving an order to put down the weapon, he did so, and voluntarily came out. When the police entered the apartment they found the body of Ms. Bolsenga lying on a bed next to the wall; she had been shot three times. Honeycutt told police as he was getting into the patrol car, "She was messin' around with guys around here and I got tired of it and I did it. I just got mad."

Before trial, mental evaluations were conducted by Richard Gowdy, Ph.D., and William Holcomb, Ph.D. Both found Honeycutt competent to stand trial, and found he was not entitled to assert the defense of mental disease or defect excluding responsibility. In August 1996, Honeycutt's defense counsel persuaded the court to order another examination, this time by a psychiatrist in private practice. Counsel hired William S. Logan, a diplomate of the American Board of Psychiatry and Neurology and also a diplomate of the American Board of Forensic Psychiatry. Dr. Logan was informed of Mr. Honeycutt's extensive mental health history. He requested all pertinent records. On August 26, 1996, Dr. Logan received some of the records related to Honeycutt's history and treatment, but other records were not forwarded by the state facility, except for summaries which had been prepared by Dr. Gowdy and Dr. Holcomb. Dr. Logan did not receive copies of investigative reports related to the homicide; and, because of time pressure to complete his report, again, relied on summaries provided by Dr. Gowdy. Dr. Logan interviewed Honeycutt on August 27 and prepared a twenty-seven page report, dated August 30, 1996. Dr. Logan concluded that Honeycutt suffered from schizoaffective disorder with borderline intellectual functioning. Dr. Logan agreed with the psychologists that Honeycutt was not so compromised by these conditions that he

was unable to appreciate the nature, quality, and wrongfulness of his conduct. He believed Honeycutt may have been paranoid, labile, and explosive, but was not so mentally ill he could not control his conduct at the time of the shooting. Dr. Logan, however, unlike the psychologists, expressed doubt about Honeycutt's competence to stand trial at that time due to his emotional lability, despondency, low intelligence, and suspicions concerning his attorney. Dr. Logan criticized the opinions of Dr. Gowdy and Dr. Holcomb that Honeycutt was feigning mental illness, setting out in detail his reasons for disagreement. Although he had not been asked about diminished capacity with regard to the issue of deliberation, Dr. Logan indicated that if he had more information in the form of the investigative reports, he might be able to express an opinion on the issue of diminished capacity:

> I would defer an opinion concerning any diminished capacity to premeditate or deliberate at the time of the offense until there has been an opportunity to review the investigative reports. From Mr. Honeycutt's description of his behavior he was not so mentally ill or intoxicated he could not control his behavior generally. He may have been paranoid, labile, and explosive, however.

Dr. Logan indicated to Honeycutt's counsel that Honeycutt had told the doctor that Honeycutt believed Cheryl Bolsenga was trying to poison him. Dr. Logan informed the attorney, Gary Allen, that if several other persons could verify that Honeycutt had made sufficient statements about the poisoning to them, it could help establish a defense. Otherwise, it would appear that Honeycutt was lying. Thereafter, Mr. Allen made attempts at contacting people who might be able to verify that Honeycutt had made statements about the

alleged attempts at poisoning. He was unable to get an address for one of them. Mr. Allen was able to contact one other, Steve Bell, but, according to counsel, Mr. Bell was not able to substantiate that Honeycutt had made any such remarks. Counsel decided at that point it would not be fruitful to pursue the matter further.

On September 3, 1996, upon receipt of Dr. Logan's report, counsel sought a continuance because of Dr. Logan's doubts about Honeycutt's competence to stand trial at that time. On September 5, the court convened a hearing, reviewed Dr. Logan's conclusions, and heard testimony from Dr. Holcomb, who testified that in his opinion Honeycutt clearly understood the trial process and the charges against him and was competent to assist in his trial. Holcomb testified Honeycutt was adept at contriving symptoms of mental illness and was a "malingerer." After considering the evidence, the court denied the motion, and the case proceeded to trial on September 9.

At trial, the appellant took the stand against counsel's advice and testified that he shot his girlfriend, not because she was "messin' around," but because she admitted attempting to poison him, and at that point he "snapped" and "unloaded." He denied making any statements to police about shooting her because she was "messin' around." He also made some extraordinary statements and called his counsel a "son of a bitch" in front of the jurors. He was convicted of first degree murder and armed criminal action.

In his Rule 29.15 motion for postconviction relief, Honeycutt asserted that his trial counsel was ineffective for (1) failing to request expert witness Dr. Logan to render an opinion as to whether Honeycutt suffered from a diminished capacity on the date of the alleged offense; and (2) not presenting Dr. Logan's expert testimony at trial as evidence that Honeycutt was unable to deliberate when he shot and killed the victim.

Counsel testified at the 29.15 hearing that he was unable to locate one of the three witnesses who supposedly heard Honeycutt make such statements, despite working through an investigator. He was able to contact one of the other individuals, Steve Beck or Steve Bell, but that the witness told counsel he knew nothing about any such statements. At that point, with the time short before trial, and having only one other name to follow up on, and thus far having no witnesses who could testify that the appellant had mentioned the "alleged poisoning situation" to them, defense counsel made a decision that a defense of insanity would not be viable, because Dr. Logan's own parameters had not allowed it.

Dr. Logan testified at the Rule 29.15 hearing that he had recently, after additional study, reached the conclusion that Honeycutt, because of his schizoaffective disorder, suffered from diminished capacity at the time of the homicide and was unable to deliberate at the time he fatally shot the victim. This opinion was based primarily upon the doctor's examination of the police reports and Honeycutt's extensive mental health records which were not supplied to him prior to his first examination and report. Dr. Logan explained that at the time of the appellant's trial, he was unable to determine if Honeycutt, in fact, lacked the capacity to deliberate because he had insufficient information upon which to base such an opinion.

The motion court made findings of fact and conclusions of law in its Order and Judgment, dated January 26, 2000, denying Honeycutt's Rule 29.15 motion. The motion court found, *inter alia:*

a. Dr. Logan testified for movant. Prior to trial in October of 1996, Dr. Logan was retained to perform a mental evalu-

ation on the movant. Dr. Logan testified at the hearing that he was not asked at that time to determine whether or not the movant suffered from a diminished capacity. At the evidentiary hearing, Dr. Logan testified that he was retained by movant's post-conviction counsel to determine if a possible diminished capacity existed. Dr. Logan's conclusion was that a diminished capacity defense did exist at the time of trial. However, in reaching his conclusion, Dr. Logan relied on several sources of information that would not have been available at the time of the initial trial. On cross-examination, Dr. Logan testified that he had informed movant's trial counsel, Gary Allen, that he would need to see the investigative reports and interviews with the movant's associates (whom he named in his initial report as JoJo, Steve Beck, and Steve Bell) before he could address the diminished capacity issue;

\* \* \*

c. Gary Allen, movant's trial counsel, testified that he had represented the movant at the trial court level. Mr. Allen stated that he retained Dr. Logan to conduct a second mental examination of the movant. Dr. Logan was not asked to address the issue of diminished capacity during his initial examination. However, Mr. Allen testified that he spoke with Dr. Logan about that issue and that Dr. Logan informed him that interviews would need to be conducted with the movant's associates to see if they could substantiate what the movant reported in his interview with the doctor. Mr. Allen testified that Dr. Logan stated that *if* the movant's associates did not substantiate the movant's claim that the victim was attempting to poison him prior to the homicide, then the defense of diminished capacity would not be a

viable one. Mr. Allen stated that based on this conversation with Dr. Logan, he used every reasonable effort and means available to him to try to find the movant's associates. Mr. Allen was successful in locating one of the associates, an individual by the name of Steve (whose last name he could not recall at the hearing) who stated that the movant never mentioned the alleged poisoning to him prior to the homicide. Mr. Allen also testified that he was unable to locate either JoJo or the other Steve. Mr. Allen stated that his efforts to locate these individuals included canvassing the apartment complex and surrounding neighborhood, as well as going to the railroad yards because Mr. Allen had information that one of them was known to "ride the rails". Mr. Allen also testified that at no time did movant ever provide any information to assist him in locating these individuals.

d. Steven Bell was called to testify by movant. Mr. Bell stated that he knew the movant and that on three occasions prior to the homicide, movant mentioned to him that he thought the victim was poisoning him. Mr. Bell also stated that he never was contacted by or spoke with a Gary Allen prior to movant's trial;

The motion court concluded, *inter alia:*

That the movant raised two primary claims: (1) that his attorney was ineffective in not asking Dr. Logan to address the issue of whether or not the movant suffered from a diminished capacity at the time of the homicide; and (2) that movant's trial counsel and appellate counsel were both ineffective for failing to ask their respective courts to address the movant's pro se Motion to Dismiss My Attorney. With regard to movant's allegations of ineffective assistance of counsel claims, the motion court concluded:

Based on the evidence adduced at the evidentiary hearing, this Court finds and concludes that movant's trial counsel, Gary Allen, used every reasonable effort in his attempt to locate movant's associates as per Dr. Logan's request. Furthermore, this court finds that trial counsel's failure to request Dr. Logan to address the issue of diminished capacity was based on Dr. Logan's representation to Mr. Allen that it would not be a viable defense unless movant's associates corroborated movant's claim that he believed the victim was trying to poison him prior to the homicide. Furthermore, movant failed to adduce any evidence at the hearing with regard to the alleged testimony of JoJo McAmara or Steven Beck and therefore fails to satisfy his burden on these claims as the basis for any possible relief.

With regard to movant's pro se motion to dismiss, the court found that movant failed to satisfy his burden in that he failed to adduce sufficient evidence to show that an irreconcilable conflict existed between himself and his attorney. In conclusion, the motion court found that movant had not proved his claims of ineffective assistance of trial and appellate counsel by a preponderance of the evidence.

Honeycutt now appeals the hearing court's denial of his Rule 29.15 motion to this court.

### Standard of Review

In an appeal of a postconviction motion, the hearing court's findings of fact and conclusions of law are presumptively correct, *State v. Gilpin,* 954 S.W.2d 570, 575 (Mo.App.1997), and appellate review is limited to a determination of whether the findings of fact and conclusions of law are "clearly erroneous." *State v. Tokar,* 918 S.W.2d 753, 761 (Mo. banc 1996); Rule 29.15(k). The motion court's decision will be considered "clearly erroneous" if a full review of the record leaves the appellate court with a definite and firm impression that a mistake has been made. *Franklin v. State,* 24 S.W.3d 686, 689 (Mo. banc 2000). The postconviction movant has the burden of proving his claims for relief by a preponderance of the evidence, pursuant to Rule 29.15(i).

"In reviewing claims of ineffective assistance of counsel, we look to whether appellant has established below that his counsel's performance failed to conform to the degree of skill, care, and diligence of a reasonably competent attorney, and that the defendant was thereby prejudiced." *Tokar,* 918 S.W.2d at 761 (*citing Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). In order to prove that his trial counsel was ineffective, *Strickland* requires the appellant to show both (1) that counsel's performance was deficient and (2) that his defense was thereby prejudiced. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. However, counsel is "strongly presumed" to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690, 104 S.Ct. 2052. The deficiency is shown by counsel's acts or omissions which, in light of all the circumstances, were "outside the wide range of professionally competent assistance." *Id.* Movant must also overcome the presumption that counsel's challenged acts or omissions were sound trial strategy. *Id.* at 689, 104 S.Ct. 2052 (*citing Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Counsel is presumed competent. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.

To meet the prejudice prong of the test, appellant must prove that there exists a "reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. Prejudice exists only where trial counsel's acts or omissions are "outcome determinative." *State v. Hall,* 982 S.W.2d 675, 680–81 (Mo. banc 1998). Prejudice is not presumed from a showing of deficient performance of counsel, but must be affirmatively proved. *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding; rather, defendant must show that there is a reasonable probability that, but for the errors by counsel, the fact finder would have had a reasonable doubt respecting punishment." *Sidebottom v. State,* 781 S.W.2d 791, 796 (Mo. banc 1989) (*citing Strickland,* 466 U.S. at 693–95, 104 S.Ct. 2052).

 Additionally, the appellate court may first examine the prejudice aspect of the *Strickland* test and dispose of the claim on that ground without first resolving the performance issue. *State v. Schaal,* 806 S.W.2d 659, 668 (Mo. banc 1991). "If it is easier to dispose of the claim on the ground of lack of sufficient prejudice, the reviewing court is free to do

so." *Id.* (*quoting Sanders v. State,* 738 S.W.2d 856, 857 (Mo. banc 1987)).

## Ineffective Assistance of Counsel

### Defense counsel's failure to request doctor's opinion on "diminished capacity"

Honeycutt contends, first, that the trial court erred in denying his 29.15 motion in that he was denied his constitutional right[1] to effective assistance of counsel (*Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)), because his defense attorney failed to call an expert witness at trial who would have established a "diminished mental capacity" defense for him.

In the first case in which the Missouri Supreme Court approved the diminished capacity or partial responsibility doctrine,[2] the Court adopted the following definition:

The doctrine contended for by the defendant is sometimes referred to as that of "diminished" or "partial responsibility." This is actually a misnomer, and the theory may not be given an exact name. However, it means the allowing of proof of mental derangement short of insanity as evidence of lack of deliberate or premeditated design. In other

1. Pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article 1, sections 10 and 18(a) of the Missouri Constitution.

2. *State v. Gary,* 913 S.W.2d 822, 827 (Mo.App. 1995) explains: The defense of "diminished responsibility" or "partial responsibility" doctrine permits a defendant to introduce evidence of a mental disease or defect to prove the absence of a particular mental element of the crime.

.... Unlike the doctrine of not guilty by reason of insanity which provides a defendant is not criminally responsible for his conduct "if, at the time of such conduct, as a result of mental disease or defect he was *incapable of knowing and appreciating* the nature, quality, or wrongfulness of his conduct," § 552.030.1,

RSMo 1994, under the diminished capacity doctrine, the defendant accepts criminal responsibility for his conduct but seeks conviction of a lesser degree of the crime because the mental disease or defect *prevented the defendant from forming the mental element of the higher degree* of the crime.

"A defense of diminished capacity because the accused is incapable of forming the mental element necessary to commit a crime is necessarily based on evidence of a mental disease or defect as defined in § 552.010." Mental disease or defect is defined in § 552.010, RSMo 1994, as including "congenital and traumatic mental conditions as well as disease."

*Gary,* 913 S.W.2d at 827–28 (internal citations omitted) (emphasis added).

words, it contemplates full responsibility, not partial, but only for the crime actually committed.

*State v. Anderson,* 515 S.W.2d 534, 540 (Mo. banc 1974) *(quoting State v. Padilla,* 66 N.M. 289, 347 P.2d 312, 314 (1959)).

■ Trial counsel's performance in this case was deficient, according to Honeycutt, because counsel failed to request that Dr. Logan, a board certified forensic psychiatrist, render an opinion as to whether Mr. Honeycutt's capacity was diminished at the time of the homicide and for failing to present the testimony of Dr. Logan that Honeycutt suffered from a mental disease in the form of schizoaffective disorder, which precluded him from having the capacity to deliberate at the time of the offense. Honeycutt contends that there is a reasonable probability that but for this deficient performance by his attorney, the jury would have acquitted him of first degree murder and convicted him on second degree murder. Honeycutt states that his trial counsel's performance was deficient, also, because trial counsel admitted at the Rule 29.15 hearing that he did not ask Dr. Logan to render an opinion on the issue of diminished capacity, even after the doctor had raised the issue and reported that diminished capacity was a potentially viable defense.

Appellant complains that counsel's trial strategy was to convince the jury that, because Honeycutt had just "snapped," he did not deliberate when he shot the victim and was therefore guilty of only murder in the second degree. Trial counsel's attempt to make this argument to the jury without the benefit of any expert medical testimony rises to the level of "deficient performance" and constitutional ineffectiveness, Honeycutt asserts. Honeycutt argues, "A reasonable trial attorney would not have attempted to present a defense that the defendant was so 'nuts' and 'impulsive' that he could not have deliberated, without the aid of any expert testimony to that effect."

Counsel's deficient performance prejudiced Honeycutt, he argues, because there is a reasonable probability that, but for counsel's omissions, the jury would have convicted the defendant of murder in the second degree. Had counsel been prepared to call Dr. Logan to the stand at trial, the jury would have been presented with a different picture of Honeycutt and his mental state on the night of the offense. At the very least, he argues the jury would not have been left with the impression that Honeycutt was a "professional faker" who has been feigning his long history of mental illness. Dr. Logan's second report (after being able to examine Honeycutt's extensive mental health records) indicates that he believes that any statement by the psychologists that Honeycutt did not suffer a long history of psychotic mental illness is "absolutely inaccurate." Dr. Logan points out that Honeycutt had first been diagnosed with a psychotic mental illness over fifteen years ago, and since then has "received a diagnosis of paranoid schizophrenia or schizoaffective disorder in no fewer than 18 prior institutionalizations." Dr. Logan stated that the examining psychologist's statement that he did not suffer from such a mental illness "amounts to a blatant, deliberate falsification of Mr. Honeycutt's mental health records."

Q. Did you offer an opinion on the issue of whether Mr. Honeycutt's capacity was diminished at the time of the offense?

A. That's an awkward question. I commented on it but did not offer an opinion about it.

Q. Why did you not offer an opinion on it?

A. Because it was my belief at the time they had insufficient information.

Q. And could you describe with specificity what information you didn't have that you needed?

A. Yes. I had some difficulty getting any information at all from Mr. Allen, but did eventually receive a couple of prior forensic evaluations that had been done at the Biggs Forensic Unit. They listed numerous prior mental health records that Mr. Honeycutt—where Mr. Honeycutt had been hospitalized. I received a fraction, maybe one hospitalization and then right before my deposition a second.

I also had no police investigative reports by the time I wrote my report.

This was apparently done under quite a bit of a time pressure. I was contacted by Mr. Allen to do this evaluation in early August, set up a date to see him on August 27th. About a week later, I got a subpoena for a deposition from the Prosecutor, before I had ever even had a chance to meet with Mr. Honeycutt, and was told that there was a deadline for the evaluation. It was five days before I was scheduled to see him and there was an agreement for a short postponement. But this was very clearly an 11th hour evaluation.

Q. Did you ever receive the police reports, in connection with the homicide?

A. After I wrote my report and after I gave a deposition, the Prosecutor sent me the police reports.

Q. Did you then render an opinion on the issue of diminished capacity?

A. No, I was never contacted again. Plus there was still other additional information that I requested that was out, primarily interviews that were not contained in the police investigative reports of people he had associated with, that he had apparently told of a belief that the victim in this case, Cheryl Bolsenga, was poisoning him. Those had not been obtained and were not included in the police reports.

. . . . . .

Q. Could you inform The Court of what those additional conclusions were?

A. Yes. The first one was that Dr. Gowdy had reviewed his mental health records and summarized them and had come to a conclusion in his prior forensic evaluation that there was, after a careful review, there was no credible history of mental illness in this individual.

This was absolutely refuted by a review of those same records and some additional ones.

Mr. Honeycutt had either received a diagnosis of paranoid schizophrenia or schizoaffective disorder, in no fewer than 18 prior institutionalizations.

Interestingly, even in the county jail before he was sent to Fulton, he was treated by doctors at Tri-County Mental Health Center, who diagnosed him as having schizophrenia and gave him anti-psychotic medication and antidepressant medication, before he went to Dr. Gowdy's evaluation.

He also had been in treatment at Western Missouri Mental Health Center receiving anti-psychotic medication and antidepressant medication, immediately prior to the offense, the killing in this case.

And since he's been in the Department of Corrections, the doctors there had diagnosed him with the same diagnosis I rendered, schizoaffective disorder, and continued him on anti-psychotic

medication and antidepressant medication, over the last several years.

Interestingly, one of the doctors who rendered that diagnosis was actually his psychiatrist at Fulton while Dr. Gowdy, a psychologist, performed the evaluation. It was their policy that the psychiatrist would not render a diagnosis during a forensic evaluation.

But as soon as Mr. Honeycutt was committed to the Department of Corrections, Dr. Ready had no difficulty coming up with a diagnosis of schizoaffective disorder and prescribing medications for him.

So the evidence was fairly conclusive that any statement that this man didn't have a long history of a psychotic mental illness was absolutely inaccurate. He had been diagnosed first with this some 15 years earlier, and as I say, with 18 subsequent hospitalizations where a diagnosis of a major thought disorder like schizoaffective disorder, schizophrenia had been rendered by different treaters.

. . . . . .

I had made a request that they try and find some of these people and ask them or see if there was any confirmation in the mental health records at Western Missouri where he was being treated that he had this kind of paranoid thinking about the victim in this case, but none was forthcoming, until I think you tracked down Mr. Bell and I was able to talk with him by phone.

Mr. Bell indicated that in fact Mr. Honeycutt had mentioned that he believed the victim was poisoning him. That he became very upset and angry about it that day. That he was making very odd and bizarre statements. That Mr. Bell thought he was not on medication and told him that he needed to get back on medication.

And that Mr. Bell in fact had told him that he believed the victim was poisoning him. He mentioned that several times in the weeks leading up to this homicide.

In addition, I also spoke with his mother, Miss Sanderson, who said that immediately after this when she was able to contact him in the jail, he told her that he believed the victim had been poisoning him. So I then had more substantiation for his statement that this could have been a belief of his, at the time this homicide occurred.

. . . . . .

A. My conclusion was he does suffer from a mental disease. It's called schizoaffective disorder. It's a disease that's characterized by disordered thinking. The individual has a hard time organizing their thoughts, often rambles and digresses and has intrusive thoughts that interrupt their flow of their thinking. In addition, they also suffer delusional ideas, particularly paranoid ideas about other people, and can also experience hallucinations.

It differs from schizophrenia in that there is often a significant mood component to this illness as well, as the individual can have periods of elation or grandiosity, and at other times periods of significant depression.

Q. Did you render an opinion, based on a reasonable degree of scientific certainty, as to whether Mr. Honeycutt's capacity was diminished, at the time he shot the victim?

A. Yes.

Q. And what was your opinion?

A. I found that his capacity was diminished.

Q. Can you explain your basis for coming to that opinion?

A. Yes. He suffered a major mental illness that was characterized by hallucinations and delusions, as well as shifts in mood. He had been taking medication for this condition, but there is indication that he had stopped taking the medication.

The major symptoms of his illness had returned. He was again hallucinating and had grown paranoid about the victim in this case and was not having rational thoughts.

Even the witnesses and from the police reports mentioned that there had been a fairly heated shouting coming from the apartment on at least two occasions, prior to the shooting. That he was in a period of emotional excitement.

Given the nature of this disorder, combining the active psychotic phase of whether they're hallucinating and having delusional thoughts about someone, generally becomes so preoccupied that they have really difficulty controlling their aggressive impulses towards someone.

. . . . . .

Q. Were you willing to offer an opinion as to Mr. Honeycutt's mental capacity, at the time of the offense, before Mr. Honeycutt's case proceeded to trial, if you had been given all the information you needed and had been asked to render that opinion?

A. Sure.

Q. Would you have made yourself available to testify at trial, if Mr. Allen had expressed an interest in you testifying?

A. Yes, although certainly without additional information, the opinions I gave would have been somewhat limited, back in 1986—or '96, rather.

In the end, Honeycutt contends, Dr. Logan found the critical corroboration he was seeking in the pages of Honeycutt's extensive mental health records. Honeycutt contends that had the doctor had these records prior to trial he would have been able to testify to Honeycutt's diminished capacity at the time· of the crime, since the records revealed that Honeycutt had "had a number of prior psychotic episodes characterized by delusional thinking, auditory and visual hallucinations, and violent or suicidal thoughts and behavior often in response to command hallucinations." Dr. Logan concluded, "It is likely that Mr. Honeycutt's description of Ms. Bolsenga poisoning him is credible based on this history found in his voluminous prior mental health records."

The State responds to Honeycutt's contentions by reminding the court that some of the actions taken by his trial counsel could have amounted merely to "trial strategy," and "[t]rial strategy is not a ground for ineffective assistance of counsel." *State v. Parker,* 886 S.W.2d 908, 929 (Mo. banc 1994). The State also asserts that the expert witness, Dr. Logan, informed defense counsel that he needed additional information (*i.e.,* verification of defendant's claim that he believed the victim was poisoning him) before he could testify to the "diminished capacity" of defendant, and that defense counsel was unable, in spite of diligent efforts, to provide that needed corroboration from the associates of Honeycutt. Trial counsel explained that he did not ask Dr. Logan to offer an opinion on the issue because he was not able to corroborate, through one of Honeycutt's three associates, that Mr. Honeycutt had expressed his delusional belief before the homicide that the victim was poisoning him—the corroboration that Dr. Logan said he needed to verify diminished capaci-

ty.[3] The State asserts that "nothing in the record refutes this testimony" of defense counsel; therefore, the hearing court did not clearly err in accepting the testimony as true.

Furthermore, the State contends, in order "to prevail on a claim of ineffective assistance of counsel due to counsel's failure to call a witness to testify, the movant must show that the witness would have testified if called, and that the witness's testimony would have aided the movant's defense." *Hatcher v. State*, 4 S.W.3d 145, 150 (Mo.App.1999); *Jones v. State*, 789 S.W.2d 63, 64 (Mo.App.1990) (movant asserted his lawyer failed to investigate alibi defense; trial counsel testified he went to movant's home twice and talked to movant's family as well as other people in the neighborhood and that he made a diligent effort to seek out the evidence; motion court was not clearly erroneous in believing trial counsel's testimony). *See also King v. State*, 639 S.W.2d 396, 398 (Mo. App.1982) (evidence supported a finding that trial counsel had talked to all the witnesses presented to him by client and counsel had decided, as a matter of trial strategy, not to use them, since one of them had a criminal record and three of the four had been drinking the night of the offense).

■■■ The State also reminds us that effective assistance of counsel must be measured in light of the factual circumstances of the case. *Rodgers v. State*, 610 S.W.2d 25, 28 (Mo.App.1980). Honeycutt's trial counsel discussed the factual circumstances of this case:

> Q. Did you ever subsequently ask Dr. Logan to render an opinion on the

**3.** Dr. Logan cross-examined by Ms. Smith (prosecutor):
> Q. So it's basically investigative reports, JoJo, Steve Bell, Steve Beck. And we were there at the deposition the 11th hour.

> issue of diminished capacity, at the time of the offense?
>
> A. No, I did not.
>
> Q. Was there a reason why you did not ask him to render an opinion on that issue?
>
> A. In discussions with Dr. Logan and in his report, he noted that Mr. Honeycutt had a situation in which he was malingering. Also, basically, lying about facts and certain aspects of his mental disease were not those that would normally be found in a disease of that type.

He stated that Mr. Honeycutt had told him about three or four people that he told about the poisoning by the victim in this case. And if that could be verified, the diminished capacity defense might be a viable defense in this situation. But if those persons could not verify that Mr. Honeycutt had made repeated, long-term statements about poisoning, that-that would not be a viable defense.

> Q. Did you attempt to verify those statements from one or more of those witnesses?
>
> A. I went out. I looked for, I don't know the gentleman's name. JoJo was the name. I was finally told he was riding the rails.

I contacted the security force of the Burlington Northern, specifically Jim McKroske, who was one of their lead detectives who ran the name through the computer and checked with the other terminals, major terminals of Burlington Northern. They did not have a JoJo.

> That's the understanding that we had in that room that you needed, if you were gonna address diminished capacity?
>
> A. Right . . . . . . .

They checked also with, I believe it was the Union Pacific to see if they would have anybody in that situation. They could not find a JoJo riding the rails or who had been found by them as a known rail rider.

I spoke with a Steve. I cannot tell you whether it was Mr. Beck or Mr. Bell with regard to the situation. It took a while to run him down, but it was done through friends and businesses and where he flopped that night.

And Steve's response was he had never heard anything about this alleged poisoning situation of Mr. Honeycutt.

And in view of my conversation with Dr. Logan and the report concerning he needed verification, something to go on, as to find out whether Mr. Honeycutt was just leading him on or not, that-that situation of Steve saying he did not know and had never heard about it was one of the ones where I made the conscious decision, at that point, that the diminished capacity defense would not be viable, because Dr. Logan's own parameters had not allowed it.

. . . . . .

Q. So you were trying to get a Not Guilty by Reason of Mental Disease or Defect?

A. That's correct.

Q. Were there any instructions submitted on that?

A. No, because the doctors' reports, both the State's and mine said that he wasn't really incompetent at the time, or incompetent at the time of trial.

The strategy was with his own behaviors and the testimony of the deputies of what his behaviors had been in the jail, to put that in front of the jury and have the jury find him guilty of NGRI, which

they can do, even without the request by the defense. That was the strategy.

Q. So your strategy was to try to convince the jury that Mr. Honeycutt was nuts just based on them watching Paul be Paul?

A. That's correct.

. . . . . .

Essentially, the conflict between the State's point of view and that of Honeycutt is as follows: (1) Dr. Logan now says, in his testimony at the Rule 29.15 hearing, that if he had had Honeycutt's extensive medical records and the police report he could have offered a diminished capacity defense. He is still unclear about whether he also needed the testimony of corroborating witnesses to do so. (2) On the other hand, defense counsel apparently believed that the doctor required the testimony of witnesses to corroborate the defendant's statement that he believed the victim was poisoning him (and not just police reports or medical records) in order to offer testimony supporting the diminished capacity defense. Defense counsel was unable, despite legitimate effort, to obtain that corroborating testimony before trial.

The hearing court found "that trial counsel's failure to request Dr. Logan to address the issue of diminished capacity was based on Dr. Logan's representation to [counsel] that it would not be a viable defense unless movant's associates corroborated movant's claim that he believed the victim was trying to poison him prior to the homicide." Honeycutt claims this is a faulty conclusion on the part of the court, because the doctor told counsel that he needed substantiation of the "poisoning" claim through "any reliable source" and not just through Honeycutt's associates. And, even if counsel used every reasonable effort to locate movant's associates, Honeycutt asserts, he did not use every reasonable effort to obtain expert testimony

to support his defense of diminished capacity, because he could have put Dr. Logan on the stand to testify to this defense *if* he had provided him with the police reports and mental health records the doctor had requested.

■ In order to render effective counsel, a defense attorney has an obligation to investigate the evidence available on behalf of his client and then to take the steps necessary to produce that evidence at trial. *Perkins–Bey v. State*, 735 S.W.2d 170, 171 (Mo.App.1987). "A competent lawyer's duty is to utilize every voluntary effort to persuade a witness who possesses material facts and knowledge of an event to testify and then, if unsuccessful, to subpoena him to court in order to allow the judge to use his power to persuade the witness to present material evidence." *Id.* Because his trial counsel failed to do so, his performance was deficient, according to Honeycutt.

The *Strickland* prejudice prong is satisfied, according to Honeycutt, by the fact that if the jury had been provided a complete and accurate picture of both Honeycutt's persistent mental problems and his state of mind on the day of the offense, the jury would have found that Honeycutt did not deliberate when he shot and killed his girlfriend. Rather the jury would have acquitted Honeycutt of first degree murder and convicted him of second degree murder.

The State points out, however, that the motion court is in the best position to judge the credibility of the witnesses, and the motion court was entitled to believe defense counsel's testimony that he believed Dr. Logan needed corroboration from witnesses of Honeycutt's "poison" statements in order to advance the diminished capacity theory. The motion court was also, the State points out, entitled to believe defense counsel's statement that he

was unable to obtain that corroboration after diligent efforts. Accordingly, says the State, Honeycutt's entire argument on this point must necessarily fail. The State contends that Honeycutt's argument rests entirely upon the *disbelief* of defense counsel's testimony; therefore, this court must defer to the hearing court's superior ability to adjudge the credibility of witnesses and affirm its denial of the Rule 29.15 motion.

Further, says the State, Honeycutt's counsel was faced with the problem that there would be testimony from police that Honeycutt said he shot her because she was "messin' around." Honeycutt would deny that he ever made that remark. Two psychologists were prepared to testify that Honeycutt was then, at the time of trial, feigning mental illness, and would have done so if Logan had testified. If the defense had called Dr. Logan to the stand to testify that Honeycutt was suffering from schizoaffective disorder, but Logan still had to maintain (as he did in his report and deposition) that Honeycutt was still legally responsible for his actions, there would have been little or no benefit to Honeycutt. Moreover, it could have invited Gowdy and Holcomb to testify that Honeycutt was a faker who had managed to deceive Dr. Logan. Honeycutt's unusual demeanor at trial would also have fit with the notion that Honeycutt was acting. Counsel was aware that he could call Dr. Logan to testify, but he faced the dilemma that Logan's testimony would not provide a defense of not guilty by reason of insanity, nor would it (in accordance with what counsel knew at that time) have provided a partial defense of diminished capacity. It would also have invited Holcomb and Gowdy to take further shots at Honeycutt as a man feigning mental illness.

■ The key issue, of course, in evaluating counsel's performance, is counsel's

overall performance. *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052. Here, counsel was faced with a difficult case to defend:

1. There were no issues of self-defense, identity, or alibi.
2. Honeycutt reportedly told police he shot the victim because he was tired of her "messin' around."
3. Honeycutt denies that he made such a remark to the police.
4. No qualified professional was prepared to testify that Honeycutt was entitled to a finding of not guilty by reason of insanity.
5. Two psychologists believed that he was adept at feigning mental illness and manipulating circumstances.

Nevertheless, in a diligent effort to raise the insanity issue, counsel persuaded the court to order an additional examination by a highly qualified forensic psychiatrist. That psychiatrist, although doubting that Honeycutt was competent to stand trial, nevertheless failed to reach an opinion that Honeycutt met the legal requirements for an insanity defense. Counsel arranged for the reports to be sent to Dr. Logan, but not all of the reports were provided from Fulton.[4] Counsel sought a continuance on grounds that Honeycutt was not competent to proceed to trial at that time, but counsel was unsuccessful in obtaining the continuance. Counsel had tried to locate possible witnesses who would support any claim by Honeycutt that he thought Ms. Bolsenga was poisoning him. Once it appeared to him that he could not substantiate the legitimacy of the claim of fear of poisoning, counsel had to make a strategic decision. His decision, for better or for worse, was that Honeycutt was better served by not presenting Dr. Logan; and thereby, counsel hoped, he could avoid opening up the whole issue of whether Honeycutt was feigning. As it turned out at trial, the issue ended up emerging anyway (and the prosecution argued that Honeycutt was a faker because of his actions at trial). We cannot say, however, it was unreasonable strategy at that time for counsel to believe that he could keep that issue out of the case (especially if his client did not testify), and to hope that the jury would have doubt about Honeycutt's capacity to deliberate anyway.

With all of this in mind, we believe that the motion court did not clearly err in its determination that counsel's overall performance was not constitutionally ineffective.

### Defendant's pro se motion to dismiss trial counsel

■ Secondly, the hearing court was in error, according to Honeycutt, because he suffered from ineffective assistance of counsel in that his appellate counsel failed to raise the claim at his June 16, 1998, appeal to this court that the trial court "plainly erred" in failing to inquire into and rule upon Honeycutt's timely filed, *pro se* "Motion to Dismiss My Attorney". Honeycutt asserted in that motion that he was prejudiced by this failure because he and trial counsel had "become embroiled in an irreconcilable conflict, which led to an irrefutable breakdown in communication and created a climate of hostility toward

---

4. Dr. Logan complained at the hearing that he had trouble getting reports from Mr. Allen. We are not entirely sure it is fair to lay the blame at Mr. Allen's feet. He apparently arranged through the prosecution for all of the records to be sent directly from Fulton. They were sent to Dr. Logan, but not everything was included. The shortness of the time until trial made it a difficult circumstance for everyone. There is no allegation that Allen was deficient in failing to seek a continuance simply on the basis that Dr. Logan needed to review more materials. Allen did seek a continuance, but it was on the basis that Honeycutt was not competent to stand trial.

the defense," such that appellant's right to a fair trial was compromised. The motion court found that the "movant failed to satisfy his burden in that he failed to adduce sufficient evidence to show that an irreconcilable conflict existed between himself and his attorney."

 The standard for reviewing a claim of ineffective assistance of "appellate counsel" is essentially the same as that used in a similar claim against trial counsel. *Mallett v. State,* 769 S.W.2d 77, 83 (Mo. banc 1989). The movant is expected to show both a breach of duty owed by counsel to the defendant and the prejudice resulting therefrom. *Id.* "[S]trong grounds must exist showing that counsel failed to assert a claim of error which would have required reversal had it been asserted and which was so obvious from the record that a competent and effective lawyer would have recognized it and asserted it." *Reuscher v. State,* 887 S.W.2d 588, 591 (Mo. banc 1994). The right to relief as the result of ineffective assistance of appellate counsel "inevitably tracks the plain error rule," *i.e.,* the error that was not raised on appeal must be found to have been so substantial as to amount to a manifest injustice or a miscarriage of justice. *Id.* (*citing* Rule 30.20).

Honeycutt points out that his *pro se* motion was filed more than a month before the case proceeded to trial and asserted that trial counsel had lied to him, had not given him all of the discovery materials, and would not sit and talk about the case with him at all. The trial court sent a copy of the motion to trial counsel on the day it was filed. The trial court never inquired into the reasons Honeycutt was requesting substitute counsel and never ruled on the motion. Appellate counsel did not request a certified copy of the motion to include in the appellate legal file, and she was not otherwise aware that Ho-neycutt had alleged in the motion that trial counsel would not talk to him about his case. She did acknowledge that the trial court never inquired into or ruled upon the motion or his verbal complaints in open court. She explained her failure to appeal the trial court's inaction on the motion in this way:

Q. Did you notice while preparing Mr. Honeycutt's brief on appeal whether the trial court ever addressed, inquired into or ruled on Mr. Honeycutt's motion?

A. Well, no, I don't think The Court ever did.

\* \* \*

Q. Could you determine, from the record, whether Mr. Honeycutt's dissatisfaction with counsel rose to the level of an irreconcilable conflict?

\* \* \*

A. Well, you know, I don't—I think because of the fact there wasn't a record made, I'd have to say that, no, I couldn't determine it from the record.

Q. Would you agree or disagree that—that is the reason that it's important for The Court to inquire into the client's dissatisfaction with his counsel, so the record is clear?

A. Well, yeah. And in fact if a record had been made, I probably would have raised an issue, on that point. I'm sorry. What was your question again?

Q. Would you agree or disagree that it's important for trial courts to inquire into the reasons why a client is dissatisfied with his counsel so that the record will be clear as to whether this conflict rose to the level of irreconcilable conflict?

A. Okay, yeah, I would agree with that proposition. Right, so that a record could be made so that a reviewing court could determine whether the trial court was in error in ruling on it.

\* \* \*

The State responds that Honeycutt was not prejudiced by his appellate counsel's failure to raise the issue on appeal in that, even if the motion had been ruled upon by the court, there was no reasonable likelihood the court would have ruled differently in this case. (*See Vogel v. State,* 31 S.W.3d 130, 146 (Mo.App.2000).) Honeycutt's trial counsel, Gary Allen, testified at the post-conviction relief hearing that he doubted that the trial judge would have allowed the appellant to dismiss the Public Defender's Office from the case unless he had another attorney "in the wings waiting to enter their appearance and ready to take the case over immediately."

Gary Allen testified further:

Q. Should you have asked the trial court to address Mr. Honeycutt's Pro Se Motion to Dismiss Attorney?

A. I do not recall the motion. I'm sorry.

Q. Is it your testimony that you didn't receive that motion?

A. My testimony is I don't recall the motion.

Q. What's your standard practice, if a client does file a Motion to Dismiss his attorney; do you bring that to The Court's attention, usually?

A. Well, usually, The Court if he's filed the motion himself, usually The Court has it in hand. And the standard practice under Judge Stuckey and under Judge Maloney over in Clay County was that they can't dismiss their attorney unless they

can show they have another attorney in the wings waiting to enter their appearance and ready to take the case over immediately.

\* \* \*

The State argues that because Honeycutt had filed his motion to dismiss his attorney on a *pro se* basis, but failed to serve a copy to his own trial counsel, trial counsel was not obligated to bring the motion to the attention of the court and the court was not obligated to rule upon the *pro se* motion since it was not brought to the court's attention in a timely manner by the defendant. The State contends, also, that the appellant's argument improperly attempts to shift the ineffective assistance of counsel blame from trial counsel to appellate counsel. Furthermore, the issue was not preserved at trial and therefore would be subject to only "plain error" review. Nothing in the record suggests that the trial attorney or the trial judge were aware that the motion had been filed by the defendant, according to the State. "An attorney will not be held ineffective for failure to raise unpreserved error on appeal." *Ham v. State,* 7 S.W.3d 433, 442 (Mo.App.1999).

Honeycutt's appellate attorney testified at the Rule 29.15 hearing that she did not raise the claim on appeal that the trial judge erred in not ruling on the appellant's *pro se* motion to discharge his attorney, because she had no "recollection of it really registering as an issue." She surmised that if a record had been made at trial on the issue, she might have raised the point on appeal, but since the issue had not been litigated at trial, there was nothing in the record to support a claim of an irreconcilable conflict between the appellant and his attorneys.

Honeycutt asserts that this "irreconcilable conflict" with his attorney prejudiced

the jury against him in two ways: (1) If he had not had communication problems with his attorney, then his attorney would have been able to track down his associates, who would have been able to substantiate his "poison" claims so that Dr. Logan could have testified to the diminished capacity defense; and (2) If the irreconcilable conflict had not existed between Honeycutt and his attorney, there is a reasonable probability that the fairness of the trial would not have been tainted against Honeycutt by his conduct toward his attorney at trial, which included: ignoring questions asked of him by counsel; verbally and physically abusing counsel before the jury; and threatening his counsel's life before the jury. Furthermore, if appellate counsel had brought the failure of the trial judge to rule on Honeycutt's motion up as a point on appeal, there is a reasonable probability that this court would have reversed Honeycutt's conviction.

■■■ The State's argument in response to Honeycutt's contentions that there were irreconcilable conflicts between him and his attorney that prejudiced the jury against him is that a defendant may not generate an "irreconcilable conflict" between himself and his attorney through his own misconduct. *State v. Owsley*, 959 S.W.2d 789, 793 (Mo. banc 1997). The State argues, to the extent the record contains any evidence of an "irreconcilable conflict," the motion court could have concluded that the appellant's own conduct (particularly at trial) was the sole reason for the conflict.

"To prevail on a claim of irreconcilable differences with counsel, the defendant must produce objective evidence of a 'total breakdown in communication' between the defendant and counsel." *Parker*, 886 S.W.2d at 929. Trial counsel testified at the hearing that he did not believe that he and his client had an "irreconcilable con-

flict," but that they did have some problems communicating:

Q. So it's your understanding that even if you and your client have an irreconcilable conflict and you two aren't communicating that he's still stuck with you?

A. I don't think Mr. Honeycutt and I had any irreconcilable conflicts.

Q. But didn't you just testify that you weren't communicating?

A. We weren't communicating in certain aspects of it. I got enough information out of Mr. Honeycutt to take this case to trial and prepare whatever defense there possibly could be in this case.

Because he did not like me personally had no reflection upon what I was going to be able to do for him in trial.

\* \* \*

As the State points out, "A trial court should not be obliged to grant a new trial on a claim of ineffective assistance of counsel unless there is a reasonable possibility that competent counsel could have obtained a different result." *Love v. State*, 670 S.W.2d 499, 504 (Mo. banc 1984). The State contends that since there was no substantial evidence of an "irreconcilable conflict" other than Honeycutt's conduct at trial, it is clear that his appellate counsel could not possibly have prevailed on appeal on this issue, particularly since she would have had to argue the issue as "plain error." Since she could not have prevailed on the issue, she cannot have been "ineffective" for having failed to "engage in a futile act." *Vogel*, 31 S.W.3d at 146.

We believe the motion court was not clearly erroneous in concluding that appellate counsel was not ineffective for failing to assert that the trial court erred in failing to address and rule on the motion to

dismiss counsel, because the motion, if addressed, would not have been granted.

## Conclusion

The judgment of the motion court is affirmed.