# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2047

_____

| | |
|---|---|
| Jerry Dean King, | * |
| | * |
| Appellant, | * |
| | * |
| v. | * Appeal from the United States |
| | * District Court for the |
| Mike Kemna, Superintendent; | * Western District of Missouri. |
| Jeremiah (Jay) Nixon, Attorney | * |
| General, State of Missouri, | * |
| | * |
| Appellees. | * |

_____

Submitted: January 11, 2001

Filed: September 17, 2001

_____

Before WOLLMAN, Chief Judge, HEANEY, McMILLIAN, RICHARD S.
ARNOLD, BOWMAN, BEAM, LOKEN, HANSEN, MORRIS SHEPPARD
ARNOLD, MURPHY, and BYE, Circuit Judges.

_____

LOKEN, Circuit Judge.

In 1994, Missouri inmate Jerry Dean King was convicted of first-degree assault
and armed criminal action and received two consecutive life sentences for shooting
his brother Dennis. King now appeals the denial of his 28 U.S.C. § 2254 petition for
a writ habeas corpus.  The issue is whether his trial counsel provided constitutionally
ineffective assistance in failing to investigate and present evidence of King's

diminished mental capacity. After a panel of this court reversed, we granted the State's petition for rehearing en banc and vacated the panel opinion. Concluding that King's contention is procedurally defaulted and is in any event without merit, we affirm.

## I. Factual and Procedural Background.

We state the background facts as summarized by the Missouri Court of Appeals in affirming King's conviction and the denial of state post-conviction relief. State v. King, No. 19751 (Mo. App. Mar. 24, 1997) (unpublished). In November 1993, King was living in a trailer behind his brother's home. At 4:00 a.m. on November 30, King came to the door and Dennis's wife Viola let him in. King told Dennis that he wanted to rob a bank, produced a .22 caliber pistol, and asked Dennis to load it. Dennis did so and gave the gun back to King, who put it in his pocket. After jumping around the room to prepare for the impending robbery, King asked his brother for a hug as it would be the last time they would see each other. After one hug, King asked for another. During the second hug, King pulled out the gun, shot Dennis under the arm, and ordered Dennis and Viola to the floor. Dennis wrestled with King, allowing Viola to escape. Dennis seized the gun, threw it into the front yard, and ran from the house. Viola, hiding in the backyard, heard a second gunshot.

Dennis hid in a gully when he heard King running down the road. King ran to the house of a neighbor, Kenneth Ruark, and pounded on the door. Ruark opened the door and saw King with a gunshot wound in his leg. King told Ruark that Dennis had shot him. Ruark let King inside and called for help. Five minutes later, Dennis knocked on Ruark's door. Dennis told Ruark that King had shot him. Ruark helped Dennis inside. When the brothers were together, King hit Dennis several times until Ruark intervened. Dennis repeatedly asked King why he shot him, but King did not reply. King accused Dennis of shooting him in the leg. Dennis replied, "You shot yourself . . . to make it look good."

-2-

Prior to trial, Public Defender Victor Head, representing King, moved for a mental evaluation of his client. The motion was granted, and King was examined by Dr. Harold Robb, senior psychiatrist at the Southwest Missouri Mental Health Center. Dr. Robb's seven-page report, dated January 26, 1994, was based upon a psychiatric interview with King, the court order directing the examination, the criminal complaint against King, and the police report regarding the incident. The report described in detail King's education, family and employment history, psychiatric and medical history,[1] and personal habits; King's description of the shooting incident and his relationship with his brother; and Dr. Robb's opinions as to King's speech pattern, perception, orientation, insight, judgment, mood, general sensorium, and psychomotor activity at the interview. The report concluded with a section entitled, "Report of Evaluation in Accordance with Section 552.010, RSMo," the Missouri statute defining mental disease or defect for purposes of criminal proceedings. Dr. Robb reported:

2. [King] does not suffer from a mental illness or defect as defined in Section 552.010, RSMo.

3. [King] does not suffer from a mental disease or defect that would cause him to lack capacity to understand the proceedings against him or to assist in his own defense.

4. It is my opinion, on the basis of the present examination and background information, that at the time of the alleged criminal conduct, [King] did not suffer from a mental disease or defect that wold cause

[1] In the Past Medical History section, Dr. Robb stated that King reported that he was shot in the head by his cousin five to seven years earlier, resulting in a two-week hospital stay, and has had seizures from time to time since then. King told Dr. Robb that he takes medication to prevent the seizures and does not feel that he suffered any ill effects from this injury, apart from, "[when] I'm doing something, [I] forget sometimes what I'm doing." Dr. Robb did not review King's medical records regarding this injury.

him not to know or appreciate the nature, quality or wrongfulness of his conduct or make him incapable of conforming his conduct to the requirements of the law.

Following a change of venue, Assistant Public Defender Frank Yankoviz assumed responsibility for King's defense. At trial, King claimed self-defense. He testified that Dennis had urged King to help buy and sell children, and the brothers argued because King did not want to be involved. Dennis retrieved a pistol from another room. King tried to grab the gun, and it discharged as he and Dennis wrestled. King claimed that Dennis followed him outside with a rifle, and King was shot in the leg while wrestling Dennis for the rifle. Finding Dennis's testimony more credible than King's, the jury convicted King of first-degree assault and armed criminal action. After pronouncing sentence, the trial court asked King whether he was satisfied with attorney Yankoviz's representation. King responded, "Yes, sir. No question."[2]

In June 1995, King -- represented by new counsel -- filed a motion for post-conviction relief under Missouri Supreme Court Rule 29.15. As relevant to this appeal, King alleged that trial counsel provided ineffective assistance by failing to fully investigate whether King was competent to stand trial and aid in his defense, and whether he "suffered from a mental disease or defect which would exclude criminal responsibility." At an evidentiary hearing on the motion, King presented the testimony and written evaluations of neuropsychologist Dennis Cowan and psychiatrist William Logan. Dr. Cowan noted that King exhibited very marked neuropsychological dysfunctions, attributing these deficits to King's gunshot wound

---

[2]The court therefore found no probable cause that King had received ineffective assistance, a finding required by Missouri Supreme Court Rule 29.07(b)(4) that determines whether trial counsel may represent a defendant on appeal and in any post-conviction proceeding. See Shigemura v. Groose, 45 F.3d 250, 251 (8th Cir. 1995).

to the head, other head injuries, and his history of substance abuse. Dr. Logan opined that King's gunshot wound caused extensive memory loss, cognitive difficulties, and post-traumatic stress disorder. Both experts opined that King tended to confabulate to fill gaps in his memory, which could render any trial testimony incredible. They also criticized Dr. Robb's psychiatric evaluation because Robb was aware of King's head injury but did not obtain his medical records and conduct neuropsychological testing. Dr. Logan concluded that, at the time of the November 1993 shooting, King lacked the ability to understand the nature or quality and wrongfulness of his actions, or to control his actions within the requirements of the law.

After King rested, the State called attorney Yankoviz, who testified that King had instructed him not to pursue an insanity defense "because he didn't want to end up in a psychiatric institution." Acknowledging that King had asked Yankoviz to obtain hospital records pertaining to the gunshot wound to King's head, Yankoviz testified he decided not to obtain those records because King had been "adamant about not pursuing the legal defense of not guilty by reason of mental disease or defect."

The state trial court denied King's motion for post-conviction relief, finding that King was competent to stand trial, competent to aid in his defense at trial, did not suffer from mental disease or defect excluding criminal responsibility, and "made a rational decision not to pursue the defense of mental disease or defect excluding responsibility." Based upon these findings, the court concluded that King had not established ineffective assistance of counsel. King appealed, arguing that Dr. Robb's report was inadequate and attorney Yankoviz provided ineffective assistance when he "failed to investigate whether [King] was competent to stand trial or criminally responsible for his conduct." The Missouri Court of Appeals affirmed, noting that the trial court "obviously disbelieved the testimony of Drs. Cowan and Logan."

King then filed this petition for a federal writ of habeas corpus. After quoting at length from the Missouri Court of Appeals decision, the district court[3] denied the petition, concluding:

> The resolution [of the ineffective assistance claim presented to the state courts] did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2) (as amended April 24, 1996).

On appeal, King raises for the first time a new theory -- that Yankoviz provided ineffective assistance by failing to investigate King's mental condition beyond Dr. Robb's report, not for the purpose of establishing incompetency to stand trial or lack of criminal responsibility, but for the purpose of presenting a partial defense of diminished mental capacity and of providing the jury "an explanation for the unorganized and seemingly incredible manner in which [King] testified at trial."

## II. The New Theory Is Procedurally Barred.

In his motion for state post-conviction relief, King alleged that trial counsel failed to fully investigate whether King was competent to stand trial and aid in his defense, or if he "suffered from a mental disease or defect which would *exclude* criminal responsibility." (Emphasis added.) The state courts denied the motion after an evidentiary hearing, finding that King was competent to stand trial, competent to aid in his trial defense, and "did not suffer from mental disease or defect excluding criminal responsibility." King's petition to the district court raised the same

---

[3]The HONORABLE DEAN WHIPPLE, Chief Judge of the United States District Court for the Western District of Missouri.

ineffective assistance theory. On appeal, he argues for the first time that counsel provided ineffective assistance in not investigating and pursuing the partial defense of diminished mental capacity. That theory was procedurally defaulted in the state courts. It is "the settled law of this Circuit that a habeas petitioner must have raised both the factual and legal bases for each ineffectiveness of counsel claim in the state courts in order to preserve the claim for federal review." Flieger v. Delo, 16 F.3d 878, 885 (8th Cir.), cert. denied, 513 U.S. 946 (1994).

The State did not argue procedural default to our panel. That omission was obviously inadvertent, because the State argues to the court en banc that the diminished capacity theory is defaulted. In Trest v. Cain, 522 U.S. 87, 89 (1997), the Supreme Court confirmed that procedural default is an affirmative defense that should be raised by the State, and the Court held that a circuit court is not *required* to consider the issue sua sponte. The Court did not consider whether a circuit court is *permitted* to consider the issue sua sponte, but noted that in Granberry v. Greer, 481 U.S. 129 (1987), it had previously held that a circuit court may raise sua sponte a habeas petitioner's failure to exhaust state remedies. Trest, 522 U.S. at 90; see 28 U.S.C. § 2254(b)(3). In the wake of Trest and Granberry, at least nine circuits agree "that a federal court, in the exercise of its judicial discretion, may address procedural default despite the failure of the state to preserve or present the issue properly." Yeatts v. Angelone, 166 F.3d 255, 261-62 (4th Cir. 1999) (collecting cases).

We agree with our sister circuits and hold that we have discretion to consider an issue of procedural default sua sponte. We further conclude that this is a case where we should do so. The doctrine of procedural default is particularly appropriate when "an unresolved question of fact or of state law might have an important bearing" on the federal habeas claim. Granberry, 481 U.S. at 134-35. To our knowledge, no Missouri case has applied the doctrine of diminished mental capacity to a prosecution for first-degree criminal assault. King's counsel speculates that proof of diminished capacity could result in conviction for the lesser-included felony

of second-degree assault, because one form of first-degree assault is to "knowingly cause[ ] or attempt[ ] to cause serious physical injury," Mo. Ann. Stat. § 565.050.1, whereas second-degree assault is defined as "recklessly caus[ing] serious physical injury," Mo. Ann. Stat. § 565.060.1(3). But the term reckless "is not self-defining" and in the criminal law generally means disregard of a *known* risk. Farmer v. Brennan, 511 U.S. 825, 836-37 (1994). Because of King's procedural default, we do not know whether the Missouri courts would permit proof of diminished mental capacity to reduce an offense from first-degree to second-degree assault, and if so, what sort of proof would suffice. These issues of state law are critical in determining *both* aspects of the Sixth Amendment inquiry under Strickland v. Washington, 466 U.S. 668 (1984), ineffective assistance and prejudice. For these reasons, King's new theory is procedurally barred.

### III. The New Theory Fails on the Merits.

As the district court recognized, under the 1996 amendments to 28 U.S.C. § 2254(d), a federal court may grant habeas relief to a state inmate only if (1) the state court's decision was contrary to clearly established federal law, as determined by the Supreme Court, or (2) involved an unreasonable application of clearly established federal law, as determined by the Supreme Court.

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." Id. at 410 (emphasis in original). In reviewing the state court decision, a fact determination is presumed to be correct and must be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e).

To prevail on a claim of ineffective assistance, King must show that counsel's performance was deficient and that King was prejudiced by the deficient performance. See Strickland v. Washington, 466 U.S. 668, 687 (1984). Deficient performance means representation that falls "outside the wide range of professionally competent assistance." Id. at 690. Prejudice "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Here, the state court record, fairly read, establishes that King failed to prove either element of ineffective assistance under Strickland, constitutionally unreasonable legal representation or prejudice.

**A. Unreasonable representation.** Defense counsel has the "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691. In making this assessment, we look to the facts of the particular case, "viewed as of the time of counsel's conduct." Id. at 690.

King argues that Yankoviz knew of King's prior head injuries and should have procured King's medical records and a second evaluation of King's competency, sanity, and mental condition. King bases this contention on attorney Yankoviz's testimony at the state post-conviction hearing that he never obtained "any other second opinion after the State court-ordered evaluation." However, that testimony

-9-

is suspect. Apparently, Yankoviz did not recall the following colloquy at the conclusion of King's sentencing hearing, some seventeen months previously, when the court raised the question of the fee to which public defender Yankoviz was entitled:

MR. YANKOVIZ: $1,250, Judge.

THE COURT: And what is that for?

MR. YANKOVIZ: $1,000 for the trial. Then there was a pretrial hearing, motion to suppress.

THE COURT: Okay. Any other litigation expense, depositions or anything, as far as you can recall?

MR. YANKOVIZ: We did have an evaluation.

THE DEFENDANT [KING]: Two.

THE COURT: The public defender pay that or the State of Missouri.

MR. YANKOVIZ: No. The second one was out of our pocket, our expense. $250, Judge.

THE COURT: For the mental exam?

MR. YANKOVIZ: Yes, Judge.

THE COURT: So you're asking for a judgment for $1,500?

MR. YANKOVIZ: Yes, sir.

THE COURT: Okay. Okay. Mr. King, based on the amount of time and expenses spent by the public defender, they're asking for a judgment against you in the sum of $1,500 to be paid -- not to them but

-10-

to the State of Missouri Public Defender Commission.  Do you believe that $1,500 is a reasonable sum for representing you?

THE DEFENDANT:  Yes, sir.  I do.  Actually more because I believe that they've went above and beyond their duties to help me.  So, I have no problem with that.  If I have some means and ways of taking care of that, I will do it regularly.

We conclude that attorney Yankoviz's contemporaneous representation to the court that he did obtain a second mental evaluation, *to which King agreed in open court*, is far more credible than counsel's inconsistent testimony at the post-conviction hearing months later.  Thus, the record does not support King's contention that Yankoviz did no further investigation of King's mental condition beyond Dr. Robb's report.

In addition, Yankoviz was not ineffective even if he did fail to seek a second evaluation of his client for the purpose of challenging Dr. Robb's opinion that King was competent to stand trial.  King made clear to Yankoviz that he did not wish to be placed in a psychiatric institution, and the consequence of being adjudicated incompetent to stand trial is commitment to the state's department of mental health. See Mo. Ann. Stat. § 552.020.  Counsel was not obliged to disregard both Robb's report and his client's wishes and further pursue a determination that his client was not competent to proceed.  See LaRette v. Delo, 44 F.3d 681, 685-86 (8th Cir. 1995) (counsel's decision not to pursue competency defense reasonable where defendant insisted he was competent at time of offense and instructed counsel not to pursue such a defense); Sidebottom v. Delo, 46 F.3d 744, 753 (8th Cir. 1995) (counsel not compelled to seek second mental evaluation merely because first was less than favorable).

Pressing his new diminished capacity theory, King argues that Yankoviz's decision to forego further investigation into King's mental condition was based upon

counsel's ignorance of the diminished capacity partial defense. Again, this contention is based upon Yankoviz's testimony at the post-conviction hearing. When asked why he did not obtain medical records pertaining to King's gunshot wound, Yankoviz replied that "since we weren't pursuing a legal defense of not guilty by reason of mental disease or defect . . . I didn't think that that would be admissible." However, Yankoviz was not asked directly whether he was aware of the diminished capacity partial defense. This testimony does not establish counsel's ignorance.

Under Missouri law, evidence that defendant suffers from a mental disease or defect is admissible "[t]o prove that the defendant did or did not have a state of mind which is an element of the offense." Mo. Ann. Stat. § 552.015(2)(8). At least for some crimes, such evidence may establish a diminished capacity defense (also known as partial responsibility), permitting the defendant to avoid conviction of a more serious crime in favor of conviction of a lesser offense. See State v. Anderson, 515 S.W.2d 534, 540-42 (Mo. 1974) (en banc) (defendant charged with first-degree murder who presented evidence of mental disease or defect entitled to instruction on manslaughter). Because the result is conviction of a lesser crime, this partial defense avoids commitment to a state mental hospital, which is mandated for those acquitted by reason of a mental disease or defect. See Mo. Ann. Stat. § 552.040(2).

However, the diminished capacity partial defense *must be* based upon a mental disease or defect as defined in Mo. Ann. Stat. § 552.010. See State v. Larson, 941 S.W.2d 847, 854-55 (Mo. App. 1997); State v. Foster, 838 S.W.2d 60, 70-71 (Mo. App. 1992), cert. denied, 507 U.S. 994 (1993). Dr. Robb's report concluded that King "does not suffer from a mental illness or defect as defined in Section 552.010, RSMo." Thus, although Dr. Robb's report did not specifically address the question of diminished capacity, a competent Missouri criminal defense attorney reading the report would know that it ruled out a diminished capacity partial defense.

-12-

For all these reasons, giving attorney Yankoviz's judgment the "heavy measure of deference" to which it is entitled under <u>Strickland,</u> we conclude the record fully supports the state courts' determination that Yankoviz's representation did not fall below an objective standard of reasonableness.

**b. Prejudice.** After considering the testimony of Drs. Cowan and Logan at the post-conviction hearing, the state courts found that King did not suffer from a mental disease or defect as defined in Mo. Stat. Ann. § 552.010. As we have explained, under Missouri law the diminished capacity partial defense must be based upon a mental disease or defect as defined in that statute. Thus, *if* King had raised the diminished capacity ineffective assistance theory to the state courts, and *if* the Missouri courts would even recognize a diminished capacity partial defense to first-degree criminal assault, this finding would have necessitated its denial because counsel's failure to ferret out and pursue legally insufficient evidence of diminished capacity did not prejudice King's defense.

King further argues that his defense was prejudiced by the absence of expert testimony explaining why his trial testimony was meandering and disjointed. However, before King took the stand, attorney Yankoviz cautioned the jury that King "may have a little trouble. He's been shot in the head before by a cousin. . . . As a result of being shot in the past, he does have some difficulty remembering -- thinking; and he has to think a lot slower than his brother." Assuming expert testimony offered solely for this purpose would have been admissible,[4] there is no "reasonable probability" it would have affected the outcome of the trial by persuading the jury to believe King rather than his brother. King further argues that diminished capacity

---

[4]That is a highly dubious proposition. <u>See</u> Mo. Stat. Ann. § 552.015; <u>State v. Copeland</u>, 928 S.W.2d 828, 837 (Mo. 1996) (en banc); <u>State v. Davidson</u>, 941 S.W.2d 732, 735 (Mo. App. 1997) (upholding exclusion of expert testimony offered to explain defendant's inability to recount events at trial).

evidence might have persuaded the trial court to impose a more lenient sentence.  But this is rank speculation.  In explaining why he sentenced King to two consecutive life terms, the trial judge emphasized King's criminal history, which included serious violent offenses prior to the gunshot wound to the head, and the nature of King's unprovoked and life-threatening attack on his brother.  Thus, there was no Strickland prejudice.

### III. Conclusion.

For the foregoing reasons, we agree with the district court that the state courts' denial of post-conviction relief was neither contrary to nor an unreasonable application of federal law, as established by Strickland, the applicable Supreme Court precedent.  Accordingly, the judgment of the district court is affirmed.

BYE, Circuit Judge, concurring.

After receiving and considering evidence, a Missouri postconviction court found that Jerry King "did not suffer from mental disease or defect excluding criminal responsibility."  The majority and dissenting opinions present alternative interpretations of the postconviction court's finding, which is the locus of our inquiry.  See 28 U.S.C. §§ 2254(d)(2), (e)(1).  I believe that we must deny King a writ of habeas corpus under either interpretation.

The majority finds implicit in the postconviction court's factual finding a determination that King lacked a mental disease or defect.  The majority infers that because King lacked a mental disease or defect *excluding criminal responsibility*, he must also have lacked a mental disease or defect *period*.  Ante at 13.  Because King was obliged to present evidence of mental disease or defect to establish a diminished capacity defense, the majority concludes that King cannot demonstrate Strickland

prejudice. I agree with this line of reasoning, assuming for argument's sake that the majority's interpretation of the postconviction court's finding is valid.

In contrast, the dissent notes that the phrase "mental disease or defect excluding criminal responsibility" defines insanity under Missouri law, and so posits that the postconviction court's factual finding does not speak to the issue of diminished capacity at all. Post at 7. This interpretation seems slightly sounder to me. But if the postconviction court truly did not address an ineffectiveness claim relative to diminished capacity, it is because King never raised the claim. By failing to raise the claim (and thus failing to exhaust the claim in state court), King deprived the Missouri courts of an opportunity to apply their law on diminished capacity. I find Missouri law on diminished capacity deeply puzzling, and I believe that is reason enough to acknowledge *sua sponte* King's failure to exhaust the claim. Though I am reluctant to endorse frequent *sua sponte* forays into exhaustion questions, I believe federal courts may seek such a path of less resistance when necessary to avoid blundering into under-developed regions of state jurisprudence.

HEANEY, Circuit Judge, with whom McMILLIAN, RICHARD S. ARNOLD, and MURPHY, Circuit Judges, join, dissenting.

Because I believe King was deprived of constitutionally adequate representation by counsel's failure to adequately investigate and present a diminished capacity defense or to present evidence of King's mental impairments at sentencing, I respectfully dissent. In my view, this failure is justified neither by the content of Robb's report nor by this court's precedent regarding counsel's duty to investigate a client's mental functioning. I also believe King's federal petition was fairly presented to the state courts, and therefore properly exhausted.

## I. Exhaustion

King has clearly given the Missouri courts a "fair opportunity" to apply controlling legal principles to his ineffective assistance claim. Odem v. Hopkins, 192 F.3d 772, 774-75 (8th Cir. 1999) (quoting Picard v. Connor, 404 U.S. 270, 276-77 (1971). Whatever the weight of authority concerning our ability to remedy the state's oversight by raising exhaustion sua sponte, the Supreme Court has made clear that modifications to legal theories in a prisoner's federal petition do not run afoul of the exhaustion requirement so long as such "variations in [a petitioner's] legal theory" do not change "the ultimate question for disposition." Picard, 404 U.S. at 277 (internal quotation omitted); see also Sanders v. United States, 373 U.S. 1, 16 (1963) ("[I]dentical grounds may often be supported by different legal arguments . . . . Should doubts arise in particular cases as to whether two grounds are different or the same, they should be resolved in favor of the applicant.").

Here, the ultimate question for disposition, as succinctly stated by the majority, is "whether [King's] trial counsel provided constitutionally ineffective assistance in failing to investigate and present evidence of King's diminished mental capacity." Ante at 1-2. In my view, King's diminished-capacity argument is a permissible variation in the theory he presented to the state court. Cf. Sanders, 373 U.S. at 16 ("a claim of involuntary confession predicated on alleged psychological coercion does not raise a different 'ground' than does one predicated on alleged physical coercion").

## II. Merits

### A. Deficient performance

I agree with the majority that King may not predicate his ineffective-assistance claim on Yankoviz's failure to pursue a defense that, if successful, would have resulted in King's institutionalization, contrary to King's express wishes. In my view,

-16-

however, counsel provided constitutionally inadequate representation by failing to pursue the statutory defense of diminished capacity.

Counsel's judgments about the scope of investigation are entitled to a "heavy measure of deference." Strickland v. Washington, 466 U.S. 668, 691 (1984). Our decisions in Sidebottom v. Delo, 46 F.3d 744 (8th Cir. 1995) and LaRette v. Delo, 44 F.3d 681 (8th Cir. 1995) make clear that King's Sixth Amendment right to competent counsel neither required counsel to ignore his client's clear wishes regarding fundamental trial strategy nor demanded that counsel second-guess the conclusions of medical professionals in the absence of evidence to the contrary. Yankoviz's failure to pursue a diminished capacity defense, however, was based not on his client's wishes, nor on the opinion of a medical professional, but upon an erroneous view of Missouri law. As such, I conclude that King was denied the assistance of competent counsel at trial, in violation of the Sixth Amendment.

Yankoviz, in explaining his failure to obtain King's medical records, testified that he thought evidence pertaining to King's mental condition would have been inadmissible because of King's refusal to pursue a defense of not guilty by reason of mental disease or defect. The majority speculates that this statement may have reflected counsel's reliance on Robb's conclusion--reached without the benefit of King's medical records or a physical examination--that King did not suffer from a mental disease or defect. I disagree.

Counsel's testimony plainly betrays his ignorance of the availability of the diminished capacity defense; this ignorance can hardly be said to demonstrate "such skill and knowledge as will render the trial a reliable adversarial testing process." Strickland, 466 U.S. at 688. Even if Yankoviz' decision not to present a diminished capacity defense was based on Robb's conclusions as to King's mental state, however, counsel provided inadequate representation.

-17-

The purpose of Robb's examination was "to determine (1) whether [King] ha[d] the capacity to understand the proceedings against him or to assist in his own defense, and (2) whether [King], at the time of the alleged offense, as a result of mental disease or defect did not know or appreciate the nature, quality or wrongfulness of his conduct or was incapable of conforming his conduct to the requirements of the law." (Respondent's Ex. C. at 8.) In other words, Robb was directed to give an opinion as to (1) whether King was competent to stand trial, see Mo. Ann. Stat. 552.020, and (2) whether King, at the time of the offense, suffered from a mental disease or defect such that he could not be held criminally responsible for his actions, see Mo. Ann. Stat. § 552.030.

Following these instructions, Robb submitted a report in which he concluded that (1) at the time he examined King, King was not suffering from a mental illness or defect as defined in Mo. Ann. Stat. 552.010, and (2) at the time of the offense, King did not suffer from a mental disease or defect that would cause him not to know or appreciate the nature, quality or wrongfulness of his conduct or make him incapable of conforming his conduct to the requirements of the law. In Robb's opinion, then, King was competent to stand trial and could not avoid all criminal liability arising from the incident based on a mental disease or defect.

The majority reasons that a competent Missouri criminal defense attorney reading the report "would know that it ruled out a diminished capacity partial defense." Ante at 12. But the majority ignores that Robb's findings with respect to King's condition at the time the offense--the period relevant to a diminished capacity defense--were limited to the specific type of mental disease or defect contemplated in § 552.030(1), i.e., a mental disease or defect that left King unable to know or appreciate the nature, quality, or wrongfulness of his conduct or incapable of conforming his conduct to the requirements of the law. This was, after all, what Robb was asked to investigate. Robb's report left open the question as to whether King

-18-

suffered from a mental disease or defect that affected his ability to have committed the assaulted "knowingly," as required by Mo. Ann. Stat. § 565.050(1).

In my view, a competent Missouri criminal defense attorney should have known the difference between a defense of mental disease or defect excluding criminal responsibility and a diminished capacity defense, and should have recognized that Robb's report omitted any finding regarding a possible diminished capacity defense.

Even if Robb had supplied an opinion that was inconsistent with a diminished capacity defense, counsel would not have been justified in relying on such an opinion to rule out a diminished capacity defense. As the majority notes, Sidebottom stands for the proposition that Yankoviz was not compelled to seek a second evaluation "merely because [the] first was less than favorable." Ante at 11. In that case, we rejected petitioner's claim that counsel was ineffective for not seeking a second mental evaluation after an initial evaluation concluded that petitioner was not suffering from a mental disease or defect, had no history of mental disease or defect, did not have an abnormal mental condition or mental retardation that would preclude the requisite state of mind for the commission of the crime, and was capable of assisting in his own defense. Sidebottom, 46 F.3d at 752-54.

But there are important factual differences that distinguish this case from Sidebottom. First, the initial evaluation conducted in Sidebottom was not limited to an evaluation of the defendant's competency to stand trial or the existence of a mental disease or defect excluding criminal responsibility, but specifically and explicitly considered and rejected a diminished-capacity defense. See id. at 752. As I have already noted, Robb's opinion should not have led a competent Missouri attorney to rule out a diminished capacity defense. More importantly, in Sidebottom, counsel's decision not to pursue further mental evaluation was based upon an informed judgment that additional investigation would not uncover an opinion contrary to that

-19-

produced by the first evaluation. Sidebottom's attorney testified that neither his client nor any members of his family had been able to provide any evidence to contradict the findings in the initial psychological report or provide other information concerning mental disease or defect. As a result, we concluded that counsel's decision not to pursue additional mental evaluation was reasonable. See Sidebottom, 46 F.3d at 752-53.

Here, however, counsel's decision to forgo a second evaluation was not reasonable. It was not based upon an informed judgment that further investigation would not yield useful information. Rather, counsel's decision rested upon the erroneous view that any new information produced by a second evaluation would be useless by virtue of King's determination not to pursue a defense of mental disease or defect excluding responsibility. Moreover, unlike Sidebottom, there was abundant information available to Yankoviz suggesting that at the time of the offense, King suffered from a mental disease or defect under Missouri law, including King's own description of the gunshot injury and King's decidedly implausible defense theory. Indeed, Robb's own report contains information that casts some doubt on his conclusion that King was suffering from no mental disease or defect at the time Robb conducted his interview.[5] And if Yankoviz had acted on King's repeated requests to

---

[5]Missouri law defines "mental disease or defect" loosely:

The terms "mental disease or defect" include congenital and traumatic mental conditions as well as disease. They do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, whether or not such abnormality may be included under mental illness, mental disease or defect in some classifications of mental abnormality or disorder. The terms "mental disease or defect" do not include alcoholism without psychosis or drug abuse without psychosis or an abnormality manifested only by criminal sexual psychopathy . . . .

-20-

obtain his medical records pertaining to the gunshot injury, he would have had valuable information regarding the seriousness of the physical injury to King's brain, yet another reason to conduct further investigation into King's mental condition.

The majority notes testimony identified by the state at the en banc argument that would seem to establish that counsel did obtain reimbursement of $250 for a "mental exam," though we know nothing of the content of such an examination, of the method by which it was performed, of the qualifications of the examiner, or what conclusions it reached. The state did not alert the district court or the original panel to this evidence; as such, I believe we are not permitted to consider it in reaching our decision. See In re Hen House Interstate, Inc., 177 F.3d 719, 724-25 (8th Cir. 1999) (en banc), aff'd sub nom. Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1 (2000); cf. Warren v. City of Lincoln, Neb., 864 F.2d 1436, 1439 (8th Cir. 1989) (considering argument raised on en banc rehearing where "[t]he pertinent record . . . [was] fully developed . . . and [relevant] facts and circumstances [were] uncontroverted"). Moreover, in light of counsel's erroneous understanding of the diminished capacity defense, I find it difficult to believe that Yankoviz would have requested that any evaluation explore information relevant to such a defense.

## B. Prejudice

As for the impact of Yankoviz's representation, the majority's discussion of the motion court's ruling is irrelevant. First, the state courts did not find that "King did not suffer from a mental disease or defect as defined in Mo. Stat. Ann. § 552.010." Ante at 13. Rather, the court "specifically [found]: That defendant (movant) was

---

See Mo. Stat. § 552.010 (emphasis added). Although Robb prepared his report without the benefit of King's medical records, the report noted King's own account that a bullet had traveled three inches into his brain, as well as King's account that he sometimes forgot what he was doing, that he subsequently suffered from seizures that left him unconscious, and that he was taking medication to prevent the seizures.

competent to stand trial and competent to aid in his defense at trial and defendant (movant) did not suffer from mental disease or defect <u>excluding criminal responsibility</u>." (Respondent's Ex. D. at 189 (emphasis added).) Like Robb's report, the motion court's findings are silent as to the possibility of a mental disease or defect upon which a diminished capacity defense could have been based. Contrary to the majority's assertion, then, there has been no finding that would rule out or even cast doubt upon the viability of a diminished capacity defense.

Second, the judge's assessment of Cowan and Logan's testimony has no bearing on the merit of such a defense. Under Missouri law, it is the jury and not the judge who must evaluate whether the state has met its burden of proving a defendant possessed a required mens rea beyond a reasonable doubt. <u>See</u> Missouri Approved Instructions-Criminal (MAI) 308.03; <u>cf.</u> <u>Antwine v. Delo</u>, 54 F.3d 1357, 1365 ("The issue is whether the failure to discover and present evidence of [defendant's] mental condition undermines our confidence in the outcome of . . . the trial. We are concerned, then, with whether the jury--not the motion court--would have found the evidence of [defendant's] mental condition credible.").

I am similarly puzzled by the majority's attempts to cast doubt upon the availability of a diminished capacity defense in the context of first-degree assault. If King came forward with evidence of a mental disease or defect relating to his ability to have acted knowingly, the jury would have been instructed as to the state's burden of proving beyond a reasonable doubt that King acted with the required mens rea. <u>See</u> MAI 308.03. If the state failed to meet that burden, it is clear to me that King could only have been held responsible for second-degree assault under Mo. Ann. Stat. § 565.060 (recklessly causing injury to another). <u>See</u> <u>State v. Hopkins</u>, 873 S.W.2d 911 (Mo.App. 1994) (noting that under Missouri law, acting recklessly and acting knowingly are mutually exclusive; "[O]ur legislature rejected the expansion of the definition of 'knowingly' to include wilful blindness of a fact and chose to limit the definition of 'knowingly' to actual knowledge of the fact.").

-22-

In my view, King was also prejudiced by counsel's failure to inject the issue of King's mental condition into the court's sentencing considerations. Although King faced two life sentences, his attorney failed to present any reasoned argument with respect to sentencing,[6] and King was sentenced to two consecutive life terms. I concede that the prejudice analysis requires speculation; this is so in any ineffective assistance case. I note, however, that counsel presented the sentencing court with absolutely no response to the state's assertions of King's depravity and lack of remorse. I also note that the minimum sentence for a first conviction for armed criminal action under Mo. Ann. Stat. § 571.015(1) is just three years. As such, I cannot say there is no reasonable probability that evidence of King's mental impairments would have affected his sentence. See Strickland, 466 U.S. at 694 (defining prejudice).

## III. Conclusion

For the forgoing reasons, I would vacate King's sentence for assault and remand to the district court with instructions to issue the writ unless the state elects to retry him. Because King's sentence for armed criminal action may also have been tainted by counsel's failure to develop and present evidence of King's mental impairments, I would also instruct that King must be resentenced on that count if (1) a retrial on the assault charge resulted in conviction of a lesser offense, or (2) the state elected to forgo retrial, in which case the sentencing court should be instructed to

---

[6]This was the sum total of Yankoviz's sentencing argument:

> Judge, I would ask that any sentences imposed be run concurrent. And that the Court consider giving Mr. King the minimum sentence in each count. The Court heard the evidence. It was controverted, but the jury did find in favor of the State. We ask that the minimum sentence be imposed.

(Tr. Vol. II at 318.)

-23-

assume that the predicate offense for armed criminal action was a second-degree assault.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.