# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3730

_____

Paul Max Honeycutt,                    *
                                       *
                Appellant,             *
                                       *  Appeal from the United States
        v.                             *  District Court for the
                                       *  Western District of Missouri.
Don Roper, Jeremiah (Jay) Nixon,       *
                                       *
                Appellees.             *

_____

Submitted: January 10, 2005
Filed: October 17, 2005

_____

Before WOLLMAN, FAGG, and BYE, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Paul Max Honeycutt appeals from the district court's denial of his petition for writ of habeas corpus. We affirm.

## I.

Honeycutt was convicted of first degree murder and armed criminal action for the April 7, 1995, shooting death of Cheryl Bolsenga in Parkville, Missouri. Honeycutt shot Bolsenga, his live-in girlfriend, three times with a shotgun. As he was being taken into custody, he told police that "[s]he was messin' around with guys around here and I got tired of it and I did it. I just got mad."

Honeycutt's trial counsel, Gary Allen, contacted Dr. William Logan, a forensic psychiatrist, to assist with Honeycutt's defense. After learning that Honeycutt had "a long mental health history with numerous prior hospital records," Dr. Logan requested that Allen procure the records, which were located at Fulton State Hospital. Dr. Logan also asked for the investigative reports pertaining to Bolsenga's homicide. Although Allen provided summaries[1] of these materials, Dr. Logan did not receive the complete records or investigative reports.

Dr. Logan examined Honeycutt for five hours on August 27, 1996. Following the examination and his review of the summaries, Dr. Logan completed a twenty-seven page report dated August 30, 1996 ("Logan Report"). The report chronicles Honeycutt's extensive medical history and his stays in mental health facilities. According to the report, Honeycutt told Dr. Logan that he began experiencing visual hallucinations at age fourteen. Logan Rep. at 5. Dr. Logan wrote that Honeycutt had been diagnosed in 1980 as having Schizoaffective Disorder with Paranoid Features and that Honeycutt had "first reported seeing an Indian who would warn and threaten him" that year. Id. According to Dr. Logan's report, Honeycutt also received outpatient treatment in 1990 for "auditory and visual hallucinations, delusions, and suicidal and homicidal thoughts." Id. at 8. Dr. Logan noted that records from a 1995 hospitalization indicated that Honeycutt had described "an 'Indian-like' voice and a female voice who 'talked sweet.'" Id. at 11, 15. Some of the voices told Honeycutt to harm himself or others. Id. at 11.

Honeycutt told Dr. Logan that he had been attracted to but also paranoid about Bolsenga. Id. at 14. He described his fear that Bolsenga was poisoning him and his efforts to avert her attempts. Id. at 15. He told Dr. Logan that voices told him to

---

[1]The summaries were prepared by Dr. Richard Gowdy, a state expert who had examined Honeycutt after his arrest. Dr. William Holcomb also examined Honeycutt for the state.

watch out for Bolsenga.  Id. at 16.  He stated that on the day of the murder he questioned Bolsenga about any connections that she had with "the Mafia, Bikers, Rainbow People, or California" and later asked her if she had poisoned him.  Id. at 16, 17.  He told Dr. Logan that after he shot Bolsenga, he was threatened by "an approximately 18" furry little man with one red and one blue eye with white stars that rotated in its eyes" and "a 28" high chubby, bald figure with a reddish forehead," and that he shot at both of these figures.  Id.  Honeycutt denied telling the police that he shot Bolsenga because she was "messing around."  Id. at 18.

Dr. Logan determined that at the time of the murder, Honeycutt had both a mental disease, Schizoaffective Disorder, and a mental defect, borderline intellectual functioning.  Id. at 26.  He expressed "significant doubts" about Honeycutt's competence to stand trial.  Id.  Nonetheless, Dr. Logan concluded that Honeycutt "was not so compromised by [his] conditions at the time of the offense that he was unable to know and appreciate the nature, quality, and wrongfulness of his conduct." Id.  Dr. Logan opined that Honeycutt was likely malingering about shooting at the little men, but disagreed with the state's experts that other aspects of Honeycutt's mental illness were feigned.  As to diminished capacity, Dr. Logan wrote:

> I would defer an opinion concerning any diminished capacity to premeditated [sic] or deliberate at the time of the offense until there has been an opportunity to review *the investigative reports*.  From Mr. Honeycutt's description of his behavior, he was not so mentally ill or intoxicated he could not control his behavior generally.  He may have been paranoid, labile, and explosive, however.

Id. (emphasis added).  Dr. Logan also told Allen that the diminished capacity defense would not be available unless corroborating witnesses could verify that Honeycutt had claimed prior to the murder that Bolsenga was poisoning him.

Concerned that testimony from Dr. Logan would open the door for the prosecution to contend that Honeycutt was malingering, Allen decided not to have Dr. Logan testify. Against Allen's advice, Honeycutt testified on his own behalf. Contrary to his earlier statement to police, Honeycutt asserted that he shot Bolsenga because they had been arguing about bisexual fantasies and "the Mafia and the bikers," and because he had a persistent fear that she had been poisoning him. Tr. at 568-77. He testified that after he shot Bolsenga he had shot at "two of my visions." Id. at 578. The jury heard no expert testimony about Honeycutt's mental illness or whether he was malingering.

Honeycutt was found guilty and sentenced on October 3, 1996, to consecutive life sentences and an additional 1,000 years' imprisonment. Following the denial of his direct appeal, Honeycutt filed a subsequently amended motion to vacate his sentence and conviction on November 25, 1998. In preparation for Honeycutt's post-conviction challenge, Honeycutt's newly appointed counsel contacted Dr. Logan and asked him to review additional information that had not been available to Dr. Logan when he had evaluated Honeycutt. After reviewing this information, Dr. Logan provided a February 4, 1999, addendum (the "Logan Addendum") to his earlier report.[2] Dr. Logan explained in his addendum that:

> My opinion in 1996 was that Mr. Honeycutt's diagnosis was Schizoaffective Disorder. I deferred in making an opinion on the issue of whether Mr. Honeycutt suffered from diminished capacity at the time

---

[2] Dr. Logan's addendum was received into evidence in the state post-conviction court but was inadvertently excluded from the exhibits submitted to the district court as part of Honeycutt's habeas petition. The state has moved, without objection from Honeycutt, to expand the record on appeal to include the addendum. We grant the state's motion and consider the addendum in our resolution of this case.

-4-

of the offense, because I lacked critical information necessary to make that determination.

Logan Add. at 2.

After reviewing the additional information that had been provided to him, Dr. Logan concluded that at the time of Bolsenga's murder, Honeycutt was "paranoid, delusional, emotionally labile and explosive" and that "[i]n this psychotic condition Mr. Honeycutt was not able to deliberate on his actions in the killing of Ms. Bolsenga with any rationality, and did not have the capacity for cool reflection." Id. at 1.

Following an evidentiary hearing, the Circuit Court of Platte County, Missouri, denied Honeycutt's post-conviction claims. The Missouri Court of Appeals affirmed. Honeycutt v. State, 54 S.W.3d 633 (Mo. Ct. App. 2001). Honeycutt filed a *pro se* petition for writ of habeas corpus, which the district court denied. We granted a certificate of appealability on the issue of whether Allen rendered ineffective assistance "by failing to furnish Dr. Logan with complete medical and investigative reports."[3] We appointed counsel to represent Honeycutt on appeal.

## II.

To be entitled to federal habeas relief, Honeycutt must establish that the Missouri Court of Appeals's decision on the merits of his ineffective assistance claim was either contrary to or an unreasonable application of clearly established Federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). Because the Missouri Court of Appeals correctly identified Strickland v. Washington, 466 U.S. 668 (1984), as the controlling authority for ineffective assistance of counsel claims,

---

[3]We note that implicit in our characterization of the issue in the certificate of appealability (COA) is that we undertake our review pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

we address the "unreasonable application" clause of Section 2254(d). See Colvin v. Taylor, 324 F.3d 583, 587 (8th Cir. 2003). We observed in Colvin that "the Supreme Court has repeatedly stressed that an unreasonable application is different from an incorrect one." Id. We may not grant a writ of habeas corpus unless the relevant state court decision is both wrong and unreasonable. Id.

A.

The issue before us is whether the Missouri Court of Appeals unreasonably applied Strickland in concluding that Allen's failure to ensure that Dr. Logan received complete medical and investigative reports was not ineffective assistance of counsel. The Missouri Court of Appeals concluded that:

> Counsel arranged for the reports to be sent to Dr. Logan, but not all of the reports were provided from Fulton . . . . Counsel had tried to locate possible witnesses who would support any claim by Honeycutt that he thought Ms. Bolsenga was poisoning him. Once it appeared to him that he could not substantiate the legitimacy of the claim of fear of poisoning, counsel had to make a strategic decision. His decision, for better or for worse, was that Honeycutt was better served by not presenting Dr. Logan; and thereby, counsel hoped, he could avoid opening up the whole issue of whether Honeycutt was feigning. As it turned out at trial, the issue ended up emerging anyway (and the prosecution argued that Honeycutt was a faker because of his actions at trial). We cannot say, however, it was unreasonable strategy at that time for counsel to believe that he could keep that issue out of the case (especially if his client did not testify), and to hope that the jury would have doubt about Honeycutt's capacity to deliberate anyway.

> With all of this in mind, we believe that the motion court did not clearly err in its determination that counsel's overall performance was not constitutionally ineffective.

54 S.W.3d at 648. Earlier in its opinion, the court had observed that one of Honeycutt's arguments was that Allen "did not use every reasonable effort to obtain expert testimony to support his defense of diminished capacity, because he could have put Dr. Logan on the stand to testify to this defense *if* he had provided him with the police reports and mental health records the doctor had requested." Id. at 647 (emphasis in original). Accordingly, implicit in the Missouri Court of Appeals's conclusion that Allen was not constitutionally ineffective was its conclusion that Allen was not constitutionally ineffective in failing to ensure that Dr. Logan received complete medical and investigative records. This was not an unreasonable application of Strickland.

B.

Even if the Missouri Court of Appeals had unreasonably applied Strickland, we could not grant the habeas petition unless Honeycutt's constitutional rights were violated. 28 U.S.C. § 2254(a). Specifically, in order to obtain relief, Honeycutt would have to establish prejudice under Strickland. See Wiggins v. Smith, 539 U.S. 510, 525 (2003).[4] To establish prejudice, a defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Hall v. Luebbers, 296 F.3d 685, 692 (8th Cir. 2002). Because the Missouri Court of Appeals never decided whether Honeycutt had suffered prejudice,[5] we review that issue *de novo*. See Wiggins, 539 U.S. at 534 (". . . our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the Strickland analysis").

_____

[4]Honeycutt's contention that "[t]he single issue identified by the Certificate of Appealability necessarily presupposes there has in fact been prejudice" relies on an untenable interpretation of AEDPA. See supra, note 3.

[5]Although the Missouri Court of Appeals cited both case law and the positions of the parties on prejudice, it did not decide that issue.

We conclude that Honeycutt cannot demonstrate that he was prejudiced by Allen's failure to ensure that Dr. Logan received complete medical and investigative records. We first note that Dr. Logan testified at the state post-conviction hearing that the investigative records contained no information that would have affected his diagnosis.[6] Accordingly, the absence of the investigative records could not have prejudiced Honeycutt.

As for the medical records, Dr. Logan's numerous citations to specific details in portions of his addendum not relevant to Honeycutt's habeas petition[7] demonstrate that he has thoroughly reviewed the records that had not been available to him when he completed his original report. Yet Dr. Logan's addendum cites only a single detail from those records that would have factored into his evaluation pertaining to diminished capacity:

> A second fact, which has emerged from this [1999] review, is that Mr. Honeycutt has reported having visual hallucinations during previous episodes of psychosis. *This is mentioned for example in the records of the 45th Street Mental Health Center. A nurse['] s note at Spellman Hospital on 7/10/91 records he saw "little people."* His biological mother, June Sanderson, reports he has told her about seeing little

---

[6]Dr. Logan testified: "There were some things in the investigative reports that were helpful, but certainly not any information from people that were associates of [Honeycutt] about whether he had expressed paranoid ideas about [Bolsenga] previously. That wasn't in there." Mot. Hrg. Tr. at 30.

[7]Dr. Logan devotes much of his addendum to: (1) refuting Dr. Gowdy's conclusion that Honeycutt showed no signs or symptoms of mental illness, Logan Add. at 3-4; and (2) discussing information provided to him by Honeycutt's mother and Steve Bell pertaining to Honeycutt's belief that Bolsenga was poisoning him. Id. at 6. Neither issue is relevant to whether Allen was ineffective in failing to provide medical records to Dr. Logan.

> people for years prior to the April 1995 homicide. This lends credibility to Mr. Honeycutt's report he had this type of hallucination, a symptom of psychosis, when he shot his girlfriend, Cheryl Bolsenga.

Logan Add. at 5-6 (emphasis added). Contrary to Dr. Logan's contention that Honeycutt's previous reports of visual hallucinations emerged only during the 1999 review, Dr. Logan's 1996 report contains multiple references to Honeycutt's past visual hallucinations. Accordingly, the only additional piece of information relevant to the diminished capacity defense that Dr. Logan describes in his addendum is that in 1991 a nurse had noted that Honeycutt had reported seeing "little people."

We conclude that there is no reasonable probability that Dr. Logan would have had changed his professional medical opinion from "not enough information" to "diminished capacity" based solely on the nurse's note and in the absence of witnesses to corroborate Honeycutt's fear that Bolsenga was poisoning him.[8] Accordingly, there is no reasonable probability that, but for Allen's failure to ensure that Dr. Logan received complete medical records, the result of the proceeding would have been different. Cf. Hall, 296 F.3d at 692.

-------

[8]The question regarding Allen's inability to locate corroborating witnesses is not before us. Steve Bell testified during the state post-conviction hearing that he and Honeycutt were "pretty good friends" and that he had been with Honeycutt on April 7, 1995, hours before Honeycutt shot Bolsenga. Mot. Hrg. Tr. at 66. (Dr. Logan's initial report also indicated that Honeycutt had been at Bell's house earlier that day. Logan Rep. at 18.) Bell testified that Honeycutt told him that day that Bolsenga was poisoning him. Mot. Hrg. Tr. at 66. Bell and Allen did not agree whether Allen had contacted Bell as part of his investigation, id. at 41 and 67, and neither of the state courts that considered the hearing testimony made a factual finding as to the issue. Notwithstanding the possibility that Allen may have failed to contact Honeycutt's "pretty good friend" who had been with him hours before the murder, whether Allen should have investigated Bell has no bearing on the issue of whether Allen was ineffective in failing to provide complete reports to Dr. Logan.

We affirm the district court's denial of the habeas petition.

BYE, Circuit Judge, dissenting.

The issue in this appeal is whether Honeycutt was denied the Sixth Amendment right to the effective assistance of counsel when his lawyer failed to furnish his retained expert with the materials the psychiatrist repeatedly requested, namely complete medical records of his previous 18 institutionalizations and police investigative reports. The Missouri Court of Appeals held lawyer Allen's "overall performance was not constitutionally ineffective," reasoning it was not unreasonable strategy for the lawyer to decide not to present Dr. Logan's testimony at trial and "hope that the jury would have doubt about Honeycutt's capacity to deliberate anyway." Honeycutt v. State, 54 S.W.3d 633, 648 (Mo. Ct. App. 2001). The Missouri Court of Appeals noted Dr. Logan complained about not getting reports from Allen, and commented: "We are not entirely sure it is fair to lay the blame at Mr. Allen's feet. . . . The shortness of time until trial made it a difficult circumstance for everyone." Id. at 648 n.4. The majority holds the Missouri Court of Appeals's application of Strickland v. Washington, 466 U.S. 668 (1984), was not objectively unreasonable and concludes de novo Honeycutt failed to establish prejudice. I respectfully dissent.

I

In the 15 years prior to Bolsenga's murder on April 7, 1995, Honeycutt had been institutionalized 18 times. During the institutionalizations, he was diagnosed with Schizophrenia or Schizoaffective Disorder and prescribed antipsychotic medications by psychiatrists. Despite his extensive history of mental illness, on June 18, 1995, state psychologist Dr. Richard Gowdy, PhD, concluded there was no credible evidence that he suffered from a mental disease or defect excluding

responsibility. On March 10, 1996, state psychologist Dr. William Holcomb, PhD, similarly found him to not have a mental disease or defect excluding responsibility.

In August 1996, one month before trial, lawyer Allen retained a psychiatrist in private practice, Dr. William S. Logan, a diplomate of the American Board of Psychiatry and Neurology and the American Board of Forensic Psychiatry, to evaluate Honeycutt's mental state at the time of the murder. Dr. Logan asked Allen to provide copies of his medical records from his past 18 institutionalizations and police investigative reports, which the State's experts had examined. By August 26, Dr. Logan had received some but not all of the materials he had requested. Because his deposition was scheduled for September 3, Dr. Logan was forced to prepare a report without the materials he had requested and to rely on the summary of Honeycutt's mental health history in Dr. Gowdy's report. Dr. Logan's August 30, 1996, report documents his inability to obtain the records he requested from Allen. The report also explicitly warns that his conclusions in the report are based on the limited materials he was provided at the time and that an independent review of the defendant's medical records and the police investigative reports could result in different conclusions:

> This examiner was initially contacted by Mr. Allen on 8/8/96 at which point I was unavailable [illegible text] on 8/9/96 at which time an August 27, 1996 evaluation date was arranged, and Mr. Allen informed me Mr. Honeycutt's records would be arriving. On August 15, 1996 I was served with a deposition notice by Roseann A.G. Smith, First Assistant Prosecuting Attorney for Platte County. Ms. Smith informed me of a court deadline for this evaluation of August 22, 1996. Ms. Smith also indicated it would be acceptable to her if the evaluation took place as scheduled, as long as a report was completed by the time of the scheduled deposition on September 3, 1996. I contacted Mr. Allen's office on August 15, 1996 to advise of the scheduled deposition, and the need for records which had not yet arrived. Mr. Allen was out of the office. His wife did call me on the afternoon of August 16, 1996 as her

husband had just completed surgery.  I relayed the message, and she indicated she would call her husband's office to arrange transfer of records.  The above [partial] records were received in the mail at 10:00 am on Monday, August 26, 1996.

Ms. Smith informed me Mr. Honeycutt had a long mental health history with numerous prior hospital records which were not in her files, but which were in possession of Fulton State Hospital, records which presumably Mr. Honeycutt signed a release enabling the examiners at Fulton to obtain.  These records have not been forthcoming, and consist of at least eight facilities where Mr. Honeycutt previously has received mental health treatment.  Optimally, I would have had an opportunity to review these records as did the examiners at Fulton State Hospital.  These records were summarized in part by Dr. Gowdy.  Of necessity, I will rely on Dr. Gowdy's summary of these records.

An additional problem is that no investigative reports of the homicide were provided for review.  Once again, these investigative records are summarized in the two Biggs Forensic Unit evaluations.  Of necessity, I will rely on these summaries.  I cannot say, however, whether an independent review of these documents may have led to a different interpretation, provided support or lack support for various conclusions reached, or otherwise may have impact [ ] on the outcome of this evaluation.

Logan 1996 Report at 1-2 (emphasis added).

During Dr. Logan's interview of the defendant, Honeycutt told him he killed Bolsenga because he believed Bolsenga was trying to poison him.  He gave Dr. Logan the names of three individuals to whom he had expressed this belief before the murder:  JoJo, Steve Beck, and Steve Bell, the defendant's best friend with whom he had spent the day of the murder.  He also told Dr. Logan after shooting Bolsenga, he shot two figures:  "an approximately 18" furry little man with one red and one blue eye with white stars that rotated in its eyes" and a "28" high chubby, bald figure with a reddish forehead."  Logan 1996 Report at 17.

In the report, Dr. Logan concluded Honeycutt suffered from both a mental disease and a mental defect, schizoaffective disorder with borderline intellectual functioning, and expressed doubt about the defendant's competence to stand trial. He criticized the opinions of the state psychologists that Honeycutt was feigning mental illness. With respect to his mental state at the time of the murder, Dr. Logan found he was not so compromised by his mental disease and defect that he was unable to appreciate the nature, quality, and wrongfulness of his conduct. Additionally, Dr. Logan stated:

> I would defer an opinion concerning any diminished capacity to premeditate or deliberate at the time of the offense until there has been an opportunity to review the investigative reports. From Mr. Honeycutt's description of his behavior he was not so mentally ill or intoxicated he could not control his behavior generally. He may have been paranoid, labile, and explosive, however.

Dr. Logan was deposed on September 3, at which point he complained again about not receiving the medical records and police investigative reports he had previously requested. On September 4, Dr. Logan received the police investigative reports from the state prosecutor, but was never contacted again by Allen.

The case proceeded to trial on September 9. At trial, lawyer Allen did not introduce Dr. Logan's opinion or call him to testify or introduce any other expert testimony. The defendant took the stand, against Allen's advice, and admitted shooting Bolsenga. Honeycutt stated he and Bolsenga had been arguing about "the Mafia and the bikers" and his persistent fear that Bolsenga had been poisoning him. He testified he killed Bolsenga because she admitted "she poisoned [him]." The prosecution argued he was faking mental illness. The jury convicted him of first degree murder and armed criminal action.

Honeycutt filed a post-conviction motion in state court alleging Allen rendered constitutionally ineffective assistance of counsel "for (1) failing to request expert witness Dr. Logan to render an opinion as to whether Honeycutt suffered from a diminished capacity on the date of the alleged offense; and (2) not presenting Dr. Logan's expert testimony at trial as evidence that Honeycutt was unable to deliberate when he shot and killed the victim." Honeycutt, 54 S.W.3d at 637. At an evidentiary hearing on the motion, Allen provided the following explanation for not requesting a diminished capacity opinion from Dr. Logan:

> In discussions with Dr. Logan and in his report, he noted that Mr. Honeycutt had a situation in which he was malingering. Also, basically, lying about facts and certain aspects of his mental disease were not those that would normally be found in a disease of that type.
>
> He stated that Mr. Honeycutt had told him about three or four people that he told about the poisoning by the victim in this case. And if that could be verified, the diminished capacity might be a viable defense in this situation. But if those persons could not verify that Mr. Honeycutt has made repeated, long-term statements about poisoning, that—that would not be a viable defense.

Id. at 645. Allen testified he attempted to locate JoJo, whom he learned was riding the rails, by contacting the security force of the Burlington Northern, but was unsuccessful. He testified he located an individual named Steve, although he did not know if it was Beck or Bell, who denied knowing anything about the alleged poisoning. Allen testified at that point he made the decision that the diminished capacity defense would not be viable because, according to Allen, "Dr. Logan's own parameters had not allowed it." Id. at 645-46. Allen explained his trial strategy was to try to get a verdict of not guilty by reason of mental disease or defect without expert testimony by having the jury observe his client's behavior at trial and by presenting the testimony of the deputies as to his behavior in jail. Id. at 646.

-14-

Dr. Logan testified that after studying additional materials he had not received from Allen before rendering his first report in 1996 he reached the conclusion that Honeycutt's capacity to deliberate was diminished at the time of the shooting. Id. at 643-44. First, Dr. Logan testified in his opinion Honeycutt suffered from mental disease:

> My conclusion was he does suffer from a mental disease. It's called Schizoaffective Disorder. It's a disease that's characterized by disordered thinking. The individual has a hard time organizing their thoughts, often rambles and digresses and has intrusive thoughts that interrupt their flow of their thinking. In addition, they also suffer delusional ideas, particularly paranoid ideas about other people, and can also experience hallucinations.
>
> It differs from schizophrenia in that there is often a significant mood component to this illness as well, as the individual can have periods of elation or grandiosity, and at other times periods of significant depression.

Id. at 643. Dr. Logan also testified as to the basis for his opinion that the defendant's capacity was diminished at the time of the shooting:

> He suffered a major mental illness that was characterized by hallucinations and delusions, as well as shifts in mood. He had been taking medication for this condition, but there is indication that he had stopped taking the medication.
>
> The major symptoms of his illness had returned. He was again hallucinating and had grown paranoid about the victim in this case and was not having rational thoughts.
>
> Even the witnesses and from the police reports mentioned that there had been a fairly heated shouting coming from the apartment on at least two occasions, prior to the shooting. That he was in a period of emotional excitement.

-15-

> Given the nature of this disorder, combining the active psychotic phase of whether they're hallucinating and having delusional thoughts about someone, generally becomes so preoccupied that they have really difficulty controlling their aggressive impulses towards someone.

Id. at 644.

Dr. Logan also provided a second report of Honeycutt's mental state, dated February 24, 1999, which is consistent with his testimony. Dr. Logan explained he deferred making a diminished capacity diagnosis in 1996 because at the time he "lacked critical information necessary to make that determination." In his 1999 report, he notes:

> Information I lacked at that point, and which I repeatedly requested, included the police investigative reports concerning the homicide and multiple psychiatric records from nine separate mental health facilities where Mr. Honeycutt had been treated from 1980 to 1995, records which were supplied and reviewed by the state experts, Dr. Gowdy and Dr. Holcomb. I received the police investigative reports from Platte County prosecutor Roseanne Smith on September 4-5, 1996, but was never contacted by the defense attorney Gary Allen, or called to testify at Mr. Honeycutt's trial. Also received after my evaluation and deposition were several additional mental health records from Western Missouri Mental Health Center (1985, 1988, February 1995) and St. Luke's ER (4/8/95) that were copied from Fulton State Hospital and sent to the Prosecuting Attorney.

Logan 1999 Report at 2. Dr. Logan also states in the 1999 report: "It is likely that Mr. Honeycutt's description of his belief Ms. Bolsenga was poisoning him is credible based on this history found in his voluminous prior mental health records." Id. at 7. Dr. Logan testified had he been provided with the information he needed before the trial he would have rendered an opinion that the defendant's capacity to deliberate was diminished at the time of the offense. Honeycutt, 54 S.W.3d at 644.

Dr. Logan drew three conclusions after reviewing the additional materials provided by post-conviction counsel. First, Dr. Logan found "even a cursory review of Mr. Honeycutt's mental health record reveals Dr. Gowdy's statement that there is no credible evidence of mental illness amounts to a blatant, deliberate falsification of Mr. Honeycutt's mental health records." Logan 1999 Report at 5.

Second, Dr. Logan stated that in 1996 he had doubted the defendant's claim of seeing "little men." Dr. Logan explained: "One of the things that had troubled me about Mr. Honeycutt's statement at the time of the offense that he said at least two of the rounds he fired from his shotgun were fired at what he called little men. And from the records I had at the time, I could not find any confirmation that this was the type of psychotic symptom that he had ever had previously." However, after he was contacted by post-conviction counsel and provided with the complete set of the defendant's medical records, Dr. Logan discovered his "visual hallucinations of little men which are somewhat unusual or atypical" "turned out to have been reported long before" Bolsenga's murder. Similarly, in the 1999 report, Dr. Logan noted:

> A second fact which has emerged from this review, is that Mr. Honeycutt has reported having visual hallucinations during previous episodes of psychosis. This is mentioned for example in the records of the 45th Street Mental Health Center. A nurses note at Spellman Hospital on 7/10/91 records he saw "little people." His biological mother, June Sanderson, reports he has told her about seeing little people for years prior to the April 1995 homicide. This lends credibility to Mr. Honeycutt's report he had this type of hallucination, a symptom of psychosis, when he shot his girlfriend, Cheryl Bolsenga.

Logan 1999 Report at 5-6.

Third, Dr. Logan testified an additional concern about the defendant's account of his mental state at the time of the shooting was the discrepancy between his statement to the officers after the shooting, of his having killed Bolsenga because she

-17-

was unfaithful, and his statement to Dr. Gowdy, Dr. Holcomb, and Dr. Logan, that he killed Bolsenga because he confirmed his suspicions she was poisoning him. Dr. Logan testified he failed to find in the information he had in 1996 any reference that Honeycutt told anyone else Bolsenga was poisoning him prior to the murder, although he mentioned he told several friends, including Steve Bell with whom he had been the day of the murder. Dr. Logan stated he "had made a request that they try and find some of these people and ask them or see if there was any confirmation in the mental health records at Western Missouri where he was being treated that he had this kind of paranoid thinking about the victim in this case, but none was forthcoming, until [post-conviction counsel] tracked down Mr. Bell." Dr. Logan testified that Bell informed him "that in fact Mr. Honeycutt had mentioned that he believed the victim was poisoning him." Additionally, his mother, whom post-conviction counsel also contacted, told Dr. Logan that she visited her son in the county jail shortly after his arrest and he had "told her that he believed the victim had been poisoning him." Honeycutt, 54 S.W.3d at 643.

The motions court found Honeycutt was not denied the effective assistance of counsel. The Missouri Court of Appeals affirmed:

> The key issue, of course, in evaluating counsel's performance, is counsel's overall performance. Strickland, 466 U.S. at 695. Here, counsel was faced with a difficult case to defend:
>
> 1. There were no issues of self-defense, identity, or alibi.
> 2. Honeycutt reportedly told police he shot the victim because he was tired of her "messin' around."
> 3. Honeycutt denies that he made such a remark to the police.
> 4. No qualified professional was prepared to testify that Honeycutt was entitled to a finding of not guilty by reason of insanity.
> 5. Two psychologists believed that he was adept at feigning mental illness and manipulating circumstances.

Nevertheless, in a diligent effort to raise the insanity issue, counsel persuaded the court to order an additional examination by a highly qualified forensic psychiatrist. That psychiatrist, although doubting that Honeycutt was competent to stand trial, nevertheless failed to reach an opinion that Honeycutt met the legal requirements for an insanity defense. Counsel arranged for the reports to be sent to Dr. Logan, but not all of the reports were provided from Fulton. [FN 4]

> FN4 - Dr. Logan complained at the hearing that he had trouble getting reports from Mr. Allen. We are not entirely sure it is fair to lay the blame at Mr. Allen's feet. He apparently arranged through the prosecution for all the records to be sent directly from Fulton. They were sent to Dr. Logan, but not everything was included. The shortness of time until trial made it a difficult circumstance for everyone. There is no allegation that Allen was deficient in failing to seek a continuance simply on the basis that Dr. Logan needed to review more materials. Allen did seek a continuance, but it was on the basis that Honeycutt was not competent to stand trial.

Counsel sought a continuance on the grounds that Honeycutt was not competent to proceed to trial at that time, but counsel was unsuccessful in obtaining the continuance. Counsel had tried to locate possible witnesses who would support any claim by Honeycutt that he thought Ms. Bolsenga was poisoning him. Once it appeared to him that he could not substantiate the legitimacy of the claim of fear of poisoning, counsel had to make a strategic decision. His decision, for better or for worse, was that Honeycutt was better served by not presenting Dr. Logan; and thereby, counsel hoped, he could avoid opening up the whole issue of whether Honeycutt was feigning. As it turned out at trial, the issue ended up emerging anyway (and the prosecution argued that Honeycutt was a faker because of his actions at trial). We cannot say, however, it was unreasonable strategy at the time for counsel to believe that he could keep that issue out of the case

(especially if his client did not testify), and to hope that the jury would have doubt about Honeycutt's capacity to deliberate anyway.

Honeycutt, 54 S.W.3d at 647-48 & n.4.

II

The majority concludes the Missouri Court of Appeals's application of Strickland was not objectively unreasonable, without providing further explanation. I respectfully disagree.

"Ineffective assistance under Strickland is deficient performance by counsel resulting in prejudice, with performance being measured against an 'objective standard of reasonableness,' 'under prevailing professional norms.'" Rompilla v. Beard, 125 S. Ct. 2456, 2462 (2005) (quoting Strickland v. Washington, 466 U.S. 668, 687, 688 (1984); Wiggins v. Smith, 539 U.S. 510, 521 (2003)). "In judging the defense's investigation, as in applying Strickland generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made, and by giving a 'heavy measure of deference to counsel's judgments.'" Id. (quoting Strickland, 466 U.S. at 689, 691). However, "just as hindsight cannot be used to condemn counsel's performance, it cannot be used to justify it." Thomas v. Lockhart, 738 F.2d 304, 309 (8th Cir. 1984).

> "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed

-20-

for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

Wiggins, 539 U.S. at 521-22 (quoting Strickland, 466 U.S. at 690-91).

The State argues Allen's failure to provide Dr. Logan with Honeycutt's complete medical records and investigative reports despite his repeated requests for the records was a strategic decision. According to the State: "Dr. Logan told counsel that, absent corroboration from event witnesses regarding the alleged poisoning of petitioner by the victim, a diminished capacity defense would not be viable, and when that witness corroboration was not forthcoming despite reasonable investigation, counsel made the reasonable decision that further investigation into, and provision of, records would have been fruitless." The State's argument only addresses the reasonableness of the Allen's failure to rectify his initial lack of diligence in failing to provide Dr. Logan with critical documents in time for the deadline for Dr. Logan's report and deposition. This is presumably because there is no excuse for an attorney to fail to provide his expert with critical and easily obtainable information needed by the expert to render a reliable opinion.

Dr. Logan requested Allen provide these records on August 9 when Allen first retained him. On August 15, Dr. Logan telephoned Allen to inform him the records had not arrived and informed Allen of the August 22 court imposed deadline and the September 3 scheduled deposition. Dr. Logan included an explicit disclaimer in his report noting the limitations of his opinion based on the failure of defense counsel to provide complete medical and investigative records. Dr. Logan reiterated his need for complete medical records and investigative reports at his deposition. It is clear the existence of the medical records was known to Allen and everyone else involved in the case, including the State, and were apparently so easily obtainable that the State had no trouble providing the complete set of medical records to the State's experts.

-21-

It is common sense that, when retaining a psychiatrist to render an expert opinion as to a defendant's mental state at the time of the offense, it is critical to provide the expert with all medical records documenting the defendant's history of mental illness and police investigative reports. See Brown v. Sternes, 304 F.3d 677, 696-97 (7th Cir. 2002) (noting it is common knowledge that an evaluating psychiatrist's expert opinion concerning a defendant's mental status will be based primarily on "past psychiatric history, family history, criminal activity, and medical records") (citing Drope v. Missouri, 420 U.S. 162, 180 (1975); Parkus v. Delo, 33 F.3d 933 (8th Cir. 1994)); Affinito v. Hendricks, 366 F.3d 252, 260 (3d Cir. 2004) ("When the key issue in a criminal case is whether the defendant suffered from diminished capacity, we can think of nothing more critical than ensuring that the defense's psychiatric expert has as complete and accurate a description of the facts and circumstances surrounding the crime as possible. . . . A defendant's own statements to the police have to be some of the most, if at times not the most, crucial documents with which an evaluating mental health expert should be familiar."). Even if Allen somehow did not know complete medical records and police investigative reports were important for a mental status evaluation, it was unreasonable for Allen not to provide complete medical records and investigative reports to Dr. Logan when Dr. Logan informed Allen of his need for these materials and repeatedly requested Allen provide them. Not only is this common sense, but also included in the American Bar Association Standards for Criminal Justice, which the Supreme Court has long referred to "'as "guides to determining what is reasonable."'" Rompilla, 125 S. Ct. at 2466 (quoting Wiggins, 539 U.S. at 524 (quoting Strickland, 466 U.S. at 688)).

> (b) Attorney's duty to provide information. The attorney initiating an evaluation should take appropriate measures to obtain and submit to the evaluator any record or information that the mental health or mental retardation professional regards as necessary for conducting a thorough evaluation on the matter(s) referred. Ordinarily, such records and information will include relevant medical and psychological records,

police and other law enforcement reports, confessions or statements made by defendant, investigative reports, autopsy reports, toxicological studies, and transcripts of pretrial hearings. The attorney should also obtain and submit to the evaluator any other record or information that the attorney believes may be of assistance in facilitating a thorough evaluation on the matter(s) referred.

ABA Standards for Criminal Justice 7-3.5.

It was especially unreasonable for Allen to fail to provide these materials to Dr. Logan when their existence was widely known to everyone in the case and so easily obtainable that both state experts were able to get them. It would have been clear to a reasonably competent lawyer from the outset that the only defense was one based on his mental state at the time of the murder. Honeycutt confessed to murdering Bolsenga; there were no issues of identity, alibi, or self defense. Not only was a defense based on mental state clearly his only defense, it should have been evident from the outset it was likely a viable defense. In the 15 years prior to the murder, defendant had been institutionalized at least 18 times and was repeatedly diagnosed with Schizophrenia or Schizoaffective Disorder by numerous psychiatrists. These psychiatrists also treated him with antipsychotic medications. Yet, Allen never attempted to obtain his medical records until it was too late.

The State argues it was reasonable for Allen not to correct his initial error and provide Dr. Logan with the materials he insisted he needed to render a reliable opinion because Allen made the strategic decision to abandon the diminished capacity defense. However, "'[c]ounsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made.'" Kenley v. Armontrout, 937 F.2d 1298, 1308 (8th Cir. 1991) (quoting Chambers v. Armontrout, 907 F.2d 825, 835 (8th Cir. 1990) (en banc)). Without obtaining Honeycutt's complete medical records and police reports and providing them to his expert, Allen did not have sufficient

information to make a reasonable strategic decision to abandon his client's only defense. See Brown, 304 F.3d at 695-96 (rejecting counsel's claim abandonment of investigation of defendant's mental health records was strategic where counsel sought continuance of trial in order to obtain records and then inexplicably failed to find out why records had not been sent); Bouchillon v. Collins, 907 F.2d 589, 595-98 (5th Cir. 1990) (holding attorney's decision not to investigate defendant's mental health after learning of prior institutionalizations is not tactical decision where mental health was only defense); Profitt v. Waldron, 831 F.2d 1245, 1249 (5th Cir. 1987) (finding unreasonable counsel's "tactical decision" to abandon investigation of medical records from mental institution where defendant had escaped, from which they could have easily learned defendant had been previously adjudicated insane, because counsel chose instead to rely on court appointed medical expert's finding that defendant was not insane).

The State cannot claim Allen merely followed the advice of his expert when Allen failed to provide Dr. Logan with the materials Dr. Logan needed to make a reliable finding or offer reliable suggestions. "'[S]trategy resulting from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel.'" Antwine v. Delo, 54 F.3d 1357, 1367 (8th Cir. 1995) (quoting Kenley, 937 F.2d at 1304); see Jacobs v. Horn, 395 F.3d 92, 103-04 (3d Cir. 2005) (holding counsel's decision not to further investigate defendant's mental status after defense expert informed counsel he did not find any evidence of major mental illness was objectively unreasonable where counsel failed to provide expert with background information on crime or defendant's history and inform expert it was a capital case); Bloom v. Calderon, 132 F.3d 1267, 1278 (9th Cir. 1997) ("[W]hen the defense's only expert requests relevant information which is readily available, counsel inexplicably does not even attempt to provide it, and counsel then presents the expert's flawed testimony at trial, counsel's performance is deficient."); cf. Caro v. Calderon, 165 F.3d 1223, 1228 (9th Cir. 1999) ("A lawyer who knows of but does not inform his expert witnesses about . . . essential pieces of information going to the heart of the

-24-

case for mitigation does not function as 'counsel' under the Sixth Amendment."). Moreover, Dr. Logan explicitly noted in his report the inherent unreliability of the report because of Allen's failure to provide necessary documents:

> These [medical] records have not been forthcoming, and consist of at least eight facilities where Mr. Honeycutt previously has received mental health treatment. Optimally, I would have had an opportunity to review these records as did the examiners at Fulton State Hospital. These records were summarized in part by Dr. Gowdy. Of necessity, I will rely on Dr. Gowdy's summary of these records.
>
> An additional problem is that no investigative reports of the homicide were provided for review. Once again, these investigative records are summarized in the two Biggs Forensic Unit evaluations. Of necessity, I will rely on these summaries. I cannot say, however, whether an independent review of these documents may have led to a different interpretation, provided support or lack support for various conclusions reached, or otherwise may have impact [ ] on the outcome of this evaluation.

Logan 1996 Report at 1-2 (emphasis added).

I am also unimpressed with Allen's claim he decided to abandon the defense of diminished capacity because Dr. Logan told him it would not be a viable defense without witness corroboration. It was Allen's duty to investigate Missouri law and decide the viability of defenses for his client. "'Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories.'" Hill v. Lockhart, 28 F.3d 832, 837 (8th Cir. 1994) (quoting Foster v. Lockhart, 9 F.3d 722, 726 (8th Cir. 1993)); see Strickland, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of *law* and facts relevant to plausible options are virtually unchallengeable.") (emphasis added). It was also Allen's responsibility to advise Dr. Logan of the relevant law. See ABA Standards for Criminal Justice 7-3.6(a)(i) ("Duty of attorney

to explain nature of evaluation to evaluator. Whoever initiates the evaluation should inform the mental health or mental retardation professional conducting the evaluation and ensure that the professional understands . . . (i) the specific legal and factual matters relevant to the evaluation.").

This court has held a reasonably competent Missouri defense lawyer would know the Missouri law for diminished capacity. See King v. Kemna, 266 F.3d 816, 824 (8th Cir. 2001) (en banc) (holding a reasonably competent attorney would know that expert's opinion of no mental illness or defect would have ruled out diminished capacity defense under Missouri law). As explained in the Missouri Court of Appeals opinion:

> The defense of "diminished responsibility" or "partial responsibility" doctrine permits a defendant to introduce evidence of a mental disease or defect to prove the absence of a particular mental element of the crime. . . . Unlike the doctrine of not guilty by reason of insanity which provides a defendant is not criminally responsible for his conduct "if, at the time of such conduct, as a result of mental disease or defect he was *incapable of knowing and appreciating* the nature, quality, or wrongfulness of his conduct," § 552.030.1, RSMo 1994, under the diminished capacity doctrine, the defendant accepts criminal responsibility for his conduct but seeks conviction of a lesser degree of the crime because the mental disease or defect *prevented the defendant from forming the mental element of the higher degree* of the crime.
>
> "A defense of diminished capacity because the accused is incapable of forming the mental element necessary to commit a crime is necessarily based on evidence of a mental disease or defect as defined in § 552.010." Mental disease or defect is defined in § 552.010, RSMo 1994, as including "congenital and traumatic mental conditions as well as disease."

Honeycutt, 54 S.W.3d at 640 n.2 (quoting State v. Gary, 913 S.W.2d 822, 827-28 (Mo. Ct. App. 1995)) (omitting internal citations). Under the diminished capacity

defense, a jury is "entitled to consider evidence on the absence of premeditation due to mental disease or defect the same as it would have been entitled, for example, to consider evidence to show absence of premeditation on the basis of sudden provocation." State v. Anderson, 515 S.W.2d 534, 539 (Mo. 1974) (en banc). In Missouri, "a person commits the crime of first-degree murder . . . 'if he knowingly causes the death of another person after deliberation upon the matter.'" Khaalid v. Bowersox, 259 F.3d 975, 977 (8th Cir. 2001) (quoting § 565.020.1RSMo 1999)). Deliberation is defined as "cool reflection for any length of time no matter how brief." Id. (citing § 565.002(3) RSMo 1999).

If Allen had conducted an investigation of the law in Missouri governing his client's only defense, he would have known the only "parameter" to the defense of diminished capacity is evidence Honeycutt suffered from a mental disease or defect as defined in the statute. He would have also known he did not need an expert opinion on the ultimate issue, Allen only needed evidence his client suffered from a mental disease or defect. The question of the defendant's capacity to deliberate to form the intent for first degree murder is for the jury to decide beyond a reasonable doubt. In fact, under Missouri law, neither the defense or prosecution would have been permitted to offer an expert to provide an opinion as to the ultimate issue of his mental state at the time of the murder. State v. Clements, 849 S.W.2d 640, 644 (Mo. Ct. App. 1993). Because Dr. Logan already found the defendant suffered from a mental disease as defined under the statute, if Allen had conducted a minimal investigation of the law concerning his client's only defense, Allen would have known diminished capacity was not only a viable defense, but a very good one, and that it was not necessary to obtain corroboration from JoJo, Steve Beck, and Steve Bell.

The unreasonableness of Allen's actions is magnified by Allen's failure to present a real defense at trial. See Hill, 28 F.3d at 843 (stating attorneys' performance fell below objectively reasonable assistance where attorneys failed to consider and

-27-

present obvious credible defense and instead presented defense that was "barely believable at best" and undocumented); McLuckie v. Abbott, 337 F.3d 1193, 1198-99 (10th Cir. 2003) (in case where mental state was only defense, counsel's failure to present mental state defense was not strategic but due to failure to prepare and investigate such a defense until it was too late to put on a mental-state defense). As Allen explained:

> Q. So you were trying to get a Not Guilty by Reason of Mental Disease or Defect?
> A. That's correct.
> Q. Were there any instructions submitted on that?
> A. No, because the doctors' reports, both the State's and mine said that he wasn't really incompetent at the time, or incompetent at the time of trial.
> The strategy was with his own behaviors and the testimony of the deputies of what his behaviors had been in the jail, to put that in front of the jury and have the jury find him guilty of NGRI, which they can do, even without the request by the defense. That was the strategy.
> Q. So your strategy was to try to convince the jury that Mr. Honeycutt was nuts just based on them watching Paul be Paul?
> A. That's correct.

Honeycutt, 54 S.W.3d at 646.

In a footnote, the Missouri Court of Appeals noted "Dr. Logan complained at the hearing that he had trouble getting reports from Mr. Allen," but concluded: "We are not entirely sure it is fair to lay the blame at Mr. Allen's feet" because Allen had arranged through the prosecution for all the records to be sent and noted "The shortness of time until trial made it a difficult circumstance for everyone." This is an objectively unreasonable application of Strickland, which requires an examination of the reasonableness of the attorney's performance under prevailing norms. Moreover, the Missouri Court of Appeals held Allen's decision not to present Dr. Logan at trial

was a reasonable strategic decision without addressing whether Allen had conducted a reasonable investigation to make such a tactical decision and by disregarding Allen's failure to provide his expert with records Dr. Logan believed were critical. This is an objectively unreasonable application of Strickland. See Wiggins, 539 U.S. at 527-28 (holding Maryland Court of Appeals's application of Strickland was objectively unreasonable where Maryland Court of Appeals found counsels' decision was strategic without considering whether counsel were in a position to make such a tactical choice); see also Jacobs, 395 F.3d at 106-07 (holding state court unreasonably applied Strickland where state court found counsel had a reasonable basis to stop investigating based on expert's statement and disregarded counsel's failure to provide expert with necessary information for proper evaluation and highly relevant facts).

## III

Because the Missouri state courts and district court held Allen did not perform unreasonably, no court has made a finding on prejudice. Accordingly, our review is de novo. Rompilla, 125 S. Ct. at 2467. The majority holds even if Allen's failure to ensure that Dr. Logan received complete medical and investigative records was objectively unreasonable, Honeycutt fails to demonstrate prejudice. I disagree.

To establish prejudice, "a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Wiggins, 539 U.S. at 534 (quoting Strickland, 466 U.S. at 694).

The majority finds Allen's failure to provide Dr. Logan with the complete medical records he requested could not have been too prejudicial because "the only additional piece of information relevant to the diminished capacity defense that Dr.

Logan describes in his addendum is that in 1991 a nurse had noted that Honeycutt had reported seeing 'little people.'" Although this "single detail" is insignificant to the majority, it is clear from Dr. Logan's reports this "single detail" was very important to Dr. Logan's inability to render a diminished capacity opinion in 1996. In his 1996 report, Dr. Logan states:

> Dr. Gowdy noted Mr. Honeycutt described seeing people of various sizes that was inconsistent with the reports of those who are truly psychotic. Mr. Honeycutt reports a variety of different auditory and visual hallucinations. Only his report of seeing smaller men is unusual. The rest of his report, including full-size figures, intermittent auditory hallucinations at night, and command hallucinations are all commonplace. Dr. Gowdy ignores a common factor in assessing malingering in that he fails to note Mr. Honeycutt has reported all these symptoms (except little men) in other settings where there have been no outstanding criminal charges . . . .

Logan 1996 Report at 21 (emphasis added).

As Dr. Logan notes above, a common factor in assessing malingering is the report of symptoms in settings where there are no outstanding criminal charges. Dr. Gowdy's presentation of Honeycutt's mental history failed to include any previous reports of "little men." Significantly, the visual hallucination the defendant told the doctors he had at the time of the murder was of "little men." Thus, the absence of a previous report of seeing "little men" played a large role in Dr. Logan's expert opinion as to his mental state at the time of the murder, as evidenced by the conclusion section of his 1996 report:

> MENTAL STATE AT TIME OF THE OFFENSE
>
> . . . .

I agree with Drs. Gowdy and Holcomb, however, concerning Mr. Honeycutt's criminal responsibility for the homicide of Ms. Bolsenga for the following reasons.

. . . .

3. Mr. Honeycutt's reports of shooting at little men are atypical hallucinations that are not mentioned in prior records, and have not reoccurred since the homicide. <u>This symptom is likely malingered</u>.

Logan 1996 Report at 26-27 (emphasis added).

Consequently, this "single detail"also played a significant role in Allen's decision not to call Dr. Logan as an expert witness at trial, as evidenced by Allen's testimony.

Q. Was there a reason why you did not ask him to render an opinion on [diminished capacity]?

A. In discussions with Dr. Logan and in his report, he noted that Mr. Honeycutt had a situation in which he was malingering. Also, basically, lying about facts and certain aspects of his mental disease were not those that would normally be found in a disease of that type.

. . . .

And in view of my conversation with Dr. Logan and the report concerning he needed verification, something to go on, as to find out whether Mr. Honeycutt was just leading him on or not, that-that situation of Steve saying he did not know and had never heard about it was one of the ones where I made the conscious decision, at that point, that the diminished capacity defense would not be viable, because Dr. Logan's own parameters had not allowed it.

Thus, Allen, in conducting an investigation of corroborating witnesses, was operating under the belief his client was malingering symptoms concerning events surrounding the murder. If Dr. Logan had not found in his 1996 report the defendant was malingering symptoms of hallucinating little men at the time of the murder, then Allen probably would have engaged in a more meaningful investigation of corroborating witnesses. It is likely his investigation would have led him to Steve Bell, Honeycutt's best friend with whom he spent time the day of the murder, or the defendant's mother, who visited him at the jail the day of his arrest, both of whom were easily located by post-conviction counsel. It is surprising his initial investigation did not lead him to these individuals.

More importantly, if Dr. Logan had not found in his 1996 report Honeycutt was malingering symptoms of hallucinating little men at the time of the murder, Allen would probably have called Dr. Logan to testify at trial that the defendant suffered from a mental disease to establish the defense of diminished capacity and negate one of the elements of first degree murder. There would have been no reason for a competent defense lawyer not to. Under Missouri law, the defense of diminished capacity "is necessarily based on evidence of a mental disease or defect." Dr. Logan has stated: "At a minimum, if I had been called to testify, I would have testified to the length and severity of Mr. Honeycutt's Schizoaffective Disorder, which is a chronic, lifelong, disabling severe mental illness." Logan 1999 Report at 5.

The majority holds there is no reasonable probability had Allen provided Dr. Logan with complete medical records and police reports Dr. Logan would have changed his opinion from not enough information to diminished capacity without corroborating witnesses. Dr. Logan did not have to render an opinion about whether Honeycutt was able to deliberate at the time of the murder in order to be a valuable expert witness for the defense in support of a diminished capacity defense. As discussed above, in Missouri, under the diminished capacity doctrine, a jury is "entitled to consider evidence on the absence of premeditation due to mental disease

-32-

or defect the same as it would have been entitled, for example, to consider evidence to show absence of premeditation on the basis of sudden provocation." State v. Anderson, 515 S.W.2d 534, 539 (Mo. 1974) (en banc). In fact, Dr. Logan could not have rendered an opinion as to Honeycutt's ability to deliberate at the time of the murder because such is an element of the offense of first degree murder and reserved for the jury to decide. State v. Clements, 849 S.W.2d 640, 644 (Mo. Ct. App. 1993). Moreover, it was the State's burden to prove beyond a reasonable doubt that Honeycutt deliberated and the State would have had to negate the defendant's mental illness prevented him from doing so.

Presumably if Allen called Dr. Logan to testify that Honeycutt suffered from the mental disease of schizoaffective disorder, the State would have called the state psychologists to refute this. There is a reasonable probability a jury would agree with Dr. Logan, a "highly qualified" forensic psychiatrist, the defendant suffered from a mental disease at the time of the murder in view of his 18 prior diagnoses of schizophrenia or schizoaffective disorder in the 15 years before the murder in situations in which he was not in trouble with the law. In 1999, after receiving complete medical records, Dr. Logan found "even a cursory review of Mr. Honeycutt's mental health record reveals Dr. Gowdy's statement that there is no credible evidence of mental illness amounts to a blatant, deliberate falsification of Mr. Honeycutt's mental health records." Dr. Logan's 1999 report includes numerous additional diagnoses of schizophrenia or schizoaffective order omitted from Dr. Gowdy's report.

The defense of diminished capacity was Honeycutt's only defense and a viable one. Dr. Logan testified if he had been provided with the records he needed, and Allen had contacted him, he would have testified at the trial. Based on the extenuating circumstances in this case, I believe if Allen had provided complete medical records and police reports to Dr. Logan and called him to testify, there is a reasonable probability the jury would have convicted the defendant of second degree

murder. Instead, he was provided with no defense and the jury had no basis to do anything but convict him of first degree murder. This is sufficient to undermine any confidence in the outcome.

IV

Because I do not believe the kind of representation Honeycutt received at trial can possibly be what is meant by the Sixth Amendment's guarantee to the "effective assistance of counsel," I respectfully dissent.

_____